[Crim. No. 3634.  Second Dist., Div. Two.  Nov. 27, 1942.]

THE PEOPLE, Respondent, v. ERNEST WILLIAMS et al., Appellants.

Arthur H. Glanz and James H. Camplin for Appellants.

Earl Warren, Attorney General, and R. S. McLaughlin, Deputy Attorney General, for Respondent.

McCOMB, J.—From judgments of guilty on four counts of forcible rape after trial before a jury, defendants appeal.

There are also appeals from the orders denying their motions for a new trial.

The testimony introduced on behalf of the People disclosed that Cora Jackman, the prosecuting witness, was twenty-two years of age and resided with her married sister Wanda Holdaway. On the evening of March 31, 1942, the prosecuting witness and Mrs. Holdaway told Mrs. Holdaway's husband that they were going to a picture show. They arrived at the theatre at about 8:30 and found that it was too late to see the show. In place of attending the show they went to a nearby beer hall called the Friars Cafe located near the intersection of Eighth and Vermont Streets in Los Angeles. The prosecuting witness, who was employed as a "car hop" in a drive-in restaurant, was dressed in her uniform consisting of tight fitting slacks and a double breasted jacket at the time she entered the Friars Cafe.

The defendants, who are each twenty years of age and are employed by a local aircraft factory, approached the prosecuting witness and her sister while they were seated at a table in the cafe, and defendant Henderson asked Mrs. Holdaway to dance with him, which she refused to do. However, the prosecuting witness did dance with him. While defendant

Henderson was dancing, defendant Williams sat at the table and talked to Mrs. Holdaway. Between midnight and one o'clock the two women prepared to leave for home. Defendants offered to drive them home. The prosecuting witness testified that this offer was refused and that they left the cafe followed by the defendants; that when they reached the street defendant Henderson again asked them to ride home with him and his companion but the ladies again refused and started to walk rapidly down the street while defendant Henderson followed them; that as they were crossing the street defendant Williams drove up in an automobile, opened the door, and defendant Henderson pushed Mrs. Holdaway into the front seat and pulled the prosecuting witness into the back seat; that they told defendants they lived at Eleventh and New Hampshire Streets but that instead of driving them home defendants drove south on Vermont Avenue and then turned west on Pico Boulevard; and that at about this time defendants suggested that they go and get something to eat, which offer the prosecuting witness and her sister refused. They continued to drive west on Pico to Western Avenue, on which street they turned south. During this period the prosecuting witness testified that defendant Henderson tried to unbutton her jacket and kiss her, which advances she repulsed. Eventually they turned south on Crenshaw Boulevard and stopped at Stocker Avenue where Mrs. Holdaway kicked her purse from the car. Defendant Williams and Mrs. Holdaway stepped out of the car. As they did so an automobile approached, which Mrs. Holdaway stopped by running in front of it. This car contained two men, and Mrs. Holdaway entered it and was driven away. About 2:30 a.m. Mrs. Holdaway telephoned the police and said that she wanted to talk to them about two men. The policemen drove Mrs. Holdaway back to Stocker Street, where they failed to locate defendants' car, and then drove her to her home.

In the meantime, according to the testimony of the prosecuting witness, defendant Williams had returned to his car and driven away, parking on a quiet street where defendant Henderson pulled off her slacks and underpants and had an act of sexual intercourse with her contrary to her consent. Thereafter defendant Williams had an act of sexual intercourse with her contrary to her consent. During this time, although the prosecuting witness testified that she resisted the acts she admitted that she did not scream, as "there was

no one to scream to." The prosecuting witness then replaced her clothing, and, after they had driven for fifteen or twenty minutes the car was again parked and defendant Williams took off the prosecuting witness's clothes and had an act of sexual intercourse with her contrary to her wishes, which was followed by a similar act by defendant Henderson. Thereafter, after driving for some time through the southern part of the city the prosecuting witness saw a man standing beside a truck and she screamed to him. Finally defendants drove up in front of a taxi cab at Pico and Vermont Streets, where the prosecuting witness left their car, defendant Henderson giving her a dollar. Defendants then drove away. The prosecuting witness complained to the cab driver as to what had occurred, whereupon the taxi cab driver drove her to the receiving hospital, where they arrived at 3:09 in the morning. The doctor who examined the prosecuting witness testified that there were no tears about the vagina and that there were no bruises anywhere on the prosecuting witness, also that there was no hymen present. The defendants admitted all of the acts set forth above, except that they denied that the prosecuting witness had refused their advances, but on the contrary testified that, although Mrs. Holdaway did not desire to accompany them the prosecuting witness did and that she freely and willingly submitted to their advances, including the several acts of sexual intercourse which had taken place.

At the conclusion of the trial defendants requested the court to instruct the jury as follows:

"The Court instructs the Jury that a charge of this nature is particularly difficult for a defendant to clear himself of. No charge can be more easily made and none more difficult to disprove. That by the very nature of the act charged, there are no witnesses to the commission of the act excepting the parties involved. That if the Jury finds any doubt as to the commission of the said act by the defendants, they are instructed to find for the defendants and to acquit same."

The trial court refused to give the foregoing instruction, which is frequently denominated a "cautionary instruction," nor did it give any instruction on the subject covered by the requested instruction.

Defendants urge reversal of the judgment on two propositions which will be stated and answered hereunder seriatim.

*First: Was it prejudicial error for the trial court not to*

*give a "cautionary instruction" as requested above?*

This question must be answered in the affirmative and is governed by the following rules of law:

■ (1) In prosecutions for sex offenses it is error for the trial court not to give a "cautionary instruction" to the effect that such charges are "easily made and difficult to disprove" and that "the testimony of the prosecuting witness should be examined with caution." (*People* v. *Putnam,* 20 Cal.2d 885, 888, 889 [129 P.2d 367].)

■ (2) Whether the refusal to give a cautionary instruction is *prejudicial error* depends upon the circumstances of each case (*People* v. *Putnam, supra,* 892).

Applying the foregoing rules to the facts of the instant case we are of the opinion that the failure to give a "cautionary instruction" constituted prejudicial error. There is a direct conflict in the testimony of the prosecuting witness and the two defendants. This fact coupled with the conceded facts that

(1) The prosecuting witness made no outcry during the time that she was being allegedly criminally attacked;

(2) Although it was conceded that she was clothed in tight fitting slacks which she testified were removed contrary to her will, there was no evidence on her body to indicate that force was used in the removal of her clothing;

(3) Mrs. Holdaway drove away with two unknown men apparently not asking them to assist her sister who was being abused; and

(4) The trial judge made improper remarks, hereinafter referred to;

leads us to the opinion that it is probable that, had a proper cautionary instruction been given, the jury would have reached a different verdict.

■ *Second: The following comments of the trial judge constituted error:*

During the examination of the witness, Officer Dedrick, deputy prosecuting attorney McNary referred to one of the defendants as "the gentleman on the right," whereupon the following colloquy ensued between the trial judge and defense counsel:

"THE COURT: *I think the word 'gentlemen' is not only unnecessary, but inappropriate to these men.*

"MR. ZIDE: *I object to that. I think it is error and very prejudicial.*

"THE COURT: *All right, you can have whatever objection you please. The jury will pay no attention to that, but the word 'gentlemen,' I think, is very inappropriate.*

"MR. ZIDE: It applies *to everybody in the courtroom.*

"THE COURT: *I can think of a better one for them.*

"MR. ZIDE: *I object again——*

"THE COURT: *You have made your objection.*

"MR. ZIDE: *Your Honor, I object to the last statement——*

"THE COURT: *You can object all you want to.*

"MR. ZIDE: *——on the ground it is prejudicial.*

"THE COURT: *I don't think the word is appropriate.*

"MR. ZIDE: *May I object again?*

"THE COURT: *Let's hear no more from you, or you will get in trouble.*"

The foregoing reference to the defendants by the trial judge was unquestionably erroneous. Defendants were presumed to be innocent, and they were entitled to a fair trial and to receive from the jury a verdict uninfluenced by disparaging or abusive remarks from the judge. The statement of the judge, made in the presence of the jury and before the rendition of a verdict, that defendants were not gentlemen and that he could think of a better name for them, could hardly fail to indicate to the jury that the judge was firmly convinced of their guilt.

A number of cases have been brought to our attention, in which the same trial judge who presided over the instant case also presided, and in which the defendants bitterly complained of the judge's misconduct. Some of these cases and the comments which the appellate courts of this state have made in discussing the trial judge's alleged misconduct are as follows:

In *People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607], our Supreme Court said:

"When, as in this case, the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense, it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary. Neither can a plea for the application of the section of the Constitution save this situation. The fact that

a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice. In this case the defendant did not have the fair trial guaranteed to him by law and the Constitution.''

In *People* v. *Earl,* 10 Cal.App.2d 163, 166 [51 P.2d 147], it is said:

''Appellants vigorously assert that the trial court was guilty of misconduct in his remarks made while defendant Ryan was on the witness stand and in his questions directed to this defendant. The record shows that the trial judge made this statement: 'I have tried to get this witness to speak like a man, but it doesn't seem to do any good. He doesn't seem to want the jury to hear his testimony.' A little later in the record the following questions by the court and answers by the defendant Ryan appear: 'Q. You did tell the truth then occasionally, did you? . . . Q. What was your idea in telling all of those lies? A. I did not know what to say. Q. Did it ever occur to you to tell the truth? A. Yes, I tried to make it look—— Q. How did you happen to be telling all those lies on this particular case? A. I did not know what to say. Everyone was firing questions at me. Q. When people ask you questions, is it your custom to lie? A. No, it hasn't been. Q. This was just a special time, at that particular time you concluded to lie part of the time? A. I did not know what to say. Q. Didn't it ever occur to you to tell the truth? A. I told the truth as much as I knew about it. Q. That is all I wanted to ask you.' The statements made by the court and the questions asked were not proper.''

In *People* v. *Johnson,* 11 Cal.App.2d 22, 23 [52 P.2d 964], it is said:

''No citation of authority or recitation of principles of judicial decorum is necessary to brand this conduct of the trial court as improper and tending to prejudice defendant's rights. When the court belatedly attempted to remedy his judicial *faux pas* by telling the jury that he did not 'want to be deemed as having made any statement as to the truth or falsity' of the testimony of the witness in question, it is obvious that the wrong done could not be cured.''

In addition to the foregoing, several other cases have been presented for review challenging as prejudicial the inappropriate remarks made during the course of the trial by this same trial judge.

There is never an instance which justifies a trial judge or counsel in being discourteous one to the other, to witnesses, parties litigant, or jurors. Judges presiding at a trial should conduct the trial in a fair and impartial manner and refrain from making any unnecessary comments or remarks during the course of the trial which may tend to a prejudicial result to a litigant. Remarks such as those made by the trial judge in the instant case and in the cases cited above tend to bring the administration of justice into disrepute and serve as a basis for appeals. Such remarks deflect the minds of jurors from the evidence actually before them and cause them to reach conclusions based upon feeling, bias, and prejudice, rather than upon the evidence which has been properly received and from which alone they should arrive at verdicts under the law.

For the foregoing reasons the judgments and orders appealed from are and each is reversed and a new trial is ordered.

Moore, P. J., and Wood (W. J.), J., concurred.