[Crim. No. 3741. Second Dist., Div. Three. Apr. 4, 1944.]

THE PEOPLE, Respondent, v. GILBERT LEE LONG, Appellant.

Maurice A. Gleason for Appellant.

Robert W. Kenny, Attorney General, and Ward Sullivan, Deputy Attorney General, for Respondent.

SHINN, J.—Defendant was convicted by verdict of a jury of two offenses of statutory rape and one of violation of section 288 of the Penal Code. He appeals from the judgments and from an order denying his motion for new trial. The prosecuting witness was his step-daughter of the age of 13 years. She testified that the first offense of rape charged was committed January 29, 1943, the offense of violation of section 288 shortly thereafter, and the second offense of rape on February 10, 1943, all of them in the home of the parties and in the absence therefrom of her mother. The mother was employed and left the home between 6:30 and 7:00 o'clock in the morning, returning about 4:30 in the afternoon. Defendant went to work about the time his wife returned. The girl left for school early in the morning and returned home about 3:30. No other person lived in the house. The offenses were alleged to have been committed after the child's return from school and before her mother returned from work.

Defendant presents an analysis of the evidence in the case and an argument for reversal of the judgments and order upon the ground of insufficiency of the evidence. It is

essentially an appeal to this court to overthrow the conviction upon a theory that would require us to hold that the testimony of the prosecutrix did not amount to substantial evidence that defendant committed the acts charged. Prosecutrix is shown by her testimony to be a child of normal intelligence. Her testimony as to the acts of defendant of which she accused him was positive and explicit. There was, in our opinion, nothing unbelievable in the story which she related. Her mother had been married to defendant about a year and a half but defendant had lived in a room over her garage prior to the marriage. Prosecutrix testified to an act of rape committed by defendant when she was 10 years of age and that defendant had made attempts as often as once a month to commit the same offense from that time until the time of the offenses charged. She made no complaint to her mother until after the date of the latest offense charged, following which defendant was promptly arrested. She had lived with her mother ever since she was 10 years of age but before that had spent some time in Arizona with her father, he and her mother having been divorced. There were certain contradictions in the testimony of the prosecutrix to which we shall refer, and except for these and the denials of defendant of any and all acts of wrongdoing to which prosecutrix testified, it can be fairly said that her testimony was not contradicted in any material particular. There was evidence which, if believed, would have shown that one of the dates stated in the information was incorrect, but this evidence was not such as would have shown that the prosecutrix had willfully given false testimony. Upon the other hand, there was little, if any, corroboration, unless her complaint made to her mother be considered as some corroboration of her charges. And we might except also evidence concerning certain pictures that had been taken of prosecutrix and which were placed in evidence by the People. These were eight in number. She testified that they had been taken by the defendant in the home and with her camera. Defendant admitted having taken the film out of the camera; there was testimony by a police officer that he took the roll of film out of defendant's sweater pocket at the place of his employment, had the film developed and pictures printed. Prosecutrix testified in great detail as to the circumstances under which the pictures were taken; that defendant had forced her to disrobe

and when she protested and fought against it had forcibly taken her clothes off, and had struck and threatened her until she had assumed the poses depicted in the pictures. She testified that one of the acts of rape. charged immediately followed the taking of the pictures. The pictures themselves, showing the nude body of the girl, were in poses that could have suggested themselves only to one without moral sense. One who had looked at the pictures would not put it beyond the one who took them to commit acts such as those of which defendant was accused. Defendant's version of the picture episode is that upon returning from work one day he observed a boy running out of the back door of the house, who departed so suddenly that defendant was unable to recognize him; that he found prosecutrix in the house clad only in a slip and that upon inquiry she told him that the boy had been taking some pictures of her on the veranda and that they were landscape pictures; that defendant inquired whether the film was in the camera, learned that it was, took it out and later gave it to his wife and that he did not see it afterwards. The wife denied ever having seen or having had possession of the film. Defendant testified that his sweater and one which belonged to his wife had been purchased at the same time, that they were identical and were used interchangeably. There was no contradiction of this testimony. It also appeared that defendant's wife accompanied the officer to the plant where defendant worked on the occasion when the film was taken from defendant's sweater pocket.

 In his defense defendant called a number of witnesses who testified to his good general reputation for morality in the community in which he resided. One of these was Everett C. Mills, a Minister of the Gospel, who had known defendant for 8 or 10 years and had visited at his home. He testified on cross-examination that he and defendant had at least 20 mutual acquaintances, that defendant had a good reputation in the community for morality and "A. The folks in the community that I know speak well of him, everyone that I know and that I have met. Q. There are few of us that have general reputations, the community is too large, but those people that you know and know of this defendant speak well of him? A. Yes, sir." After the cross-examination had been completed there was some redirect examination, at the close of which the following took place: "MR. GLEA-

son: [defendant's counsel] That is all, your Honor. THE COURT: Is that all, Mr. Loucks? MR. LOUCKS: That is all, your Honor. THE COURT: Let Mr. Everett see this Exhibit No. 8, those eight photographs. Where are they? Will you look at those, Mr. Everett. I should have said Mr. Mills. I beg your pardon. That is all. MR. LOUCKS: May I ask one question based on that? THE COURT: Yes. Q. BY MR. LOUCKS: Mr. Mills, if you knew that the defendant took those photographs of Irene, would your opinion be the same as to his general reputation for morality? MR. GLEASON: To which I will object. Q. BY MR. LOUCKS: You heard the question, did you not? A. Not very plainly. MR. LOUCKS: Will you re-read the question? THE COURT: Reframe it. Q. BY MR. LOUCKS: Mr. Mills, having seen these eight photographs, and if you knew that the defendant took those photographs of Irene would your testimony as to the defendant's reputation be the same? MR. GLEASON: To which I will object on the ground that it is immaterial, outside of the issues, not proper impeachment and not proper cross examination, and on the further ground that it has nothing to do with the evidence or reputation of this defendant. That is merely, if it is true, it would merely be an act of one given time under certain circumstances which would not go to determine the man's character or his reputation for morality in that community. THE COURT: Well, the witness has based his statements partially on what he himself knows about the defendant. The objection is overruled. You may answer it, Mr. Mills. A. Repeat the question. THE COURT: Read it now. (Question read.) A. Well, that is a hard question to answer. Q. BY MR. LOUCKS: What is difficult about it, Mr. Mills? A. That would be a hard question to answer. THE COURT: Let's try. Mr. Mills, what is your answer? A. Knowing the man as I do, it would not change my thought toward him one particle. MR. LOUCKS: That is all. MR. GLEASON: I also want to—— For the purpose of the record—— object to the Court's direction of this witness' attention to these pictures on the ground that there was no question presented by the Court to this witness about these pictures so that I could interpose an objection of any sort, the Court merely having directed the witness' attention to the pictures, and not followed it up with any question of any sort, and I declare that is error at this time and prejudicial to the defendant, having been done in

the presence of the jury. THE COURT: The objection is overruled. Is that all now from Mr. Mills?"

This action upon the part of the court was, in our opinion, highly prejudicial to the rights of the defendant. The district attorney had not endeavored to make use of the pictures upon cross-examination in an effort to cause the witness to change his testimony as to the reputation of defendant. This procedure was suggested by the judge, and the district attorney, as was to be expected, followed the suggestion. He had not been remiss in the performance of his duties in any particular; he was conducting a vigorous prosecution and had cross-examined the witness in a competent and thorough manner. The questioning of the witness in the manner suggested by the court was not proper cross-examination.

It is true that the witness had testified, in answer to questions by the district attorney, that he took into consideration his own belief as to defendant's good character, but this statement, elicited on cross-examination, was purely incidental and did not go to the substance of the testimony. It is clear from the entire examination, especially the cross-examination, that the witness distinguished between his own estimate of defendant's character, based upon personal acquaintance and knowledge, and the matter of defendant's general reputation in the community for morality. He was shown to be qualified to testify as to defendant's general reputation and he expressly stated that he testified from what he had been told and had heard said of defendant by mutual acquaintances and friends. His own belief in the defendant's good character was not given as the basis of his testimony but was an additional fact brought out by the district attorney. The fact that the witness shared in what he testified was the general belief did not shift the basis for his testimony or open the door for the character of cross-examination suggested by the judge. It is too plain to require discussion that the taking of the pictures by defendant under the circumstances testified to would have had no bearing upon his general reputation. The jury could not have given proper consideration to the character testimony unless they understood that the reputation of the defendant as to the trait in question was the estimation in which he was held in the community, and not merely what the several character witnesses thought of him. The questioning of the witness as directed by the court plainly sug-

gested that the individual estimation of the witness was an important, if not a controlling, factor and it clearly tended to mislead and confuse the jury. But the harm did not come alone from the irrelevancy of the matter inquired about; it came also, and with far greater force, from the action of the judge in assuming the role of prosecutor. Whether consciously or not, the judge aligned himself with the prosecution, and the jurors could not have failed to realize that he had done so. If the district attorney had propounded his questions without prompting by the court it would have been the duty of the judge to sustain objections to them as improper cross-examination. In that case the ruling would have indicated to the jury that the testimony of the character witnesses was to be weighed according to its intrinsic worth and was not to be confused with specific accusations which had been made against defendant, the truth of which he had not admitted. There was manifested, in the direction of the judge that the pictures be shown to the witness, that in the opinion of the judge, at least, an examination of the pictures would or should cause the witness to change his belief as to the general reputation of defendant and to alter his testimony accordingly. The witness did not change his previous answers, and of course if he had done so, the result would have been harmful to the defendant. The fact that the witness did not change his answers was also harmful, for the jurors must have believed that in the opinion of the judge an examination of the pictures would or should cause him to alter his testimony, else the judge would not have directed that they be shown to him. And when the witness, after protesting that the question was a difficult one, was obliged to again state his belief based in part upon the supposition that defendant had taken the pictures, and still was of the belief that he enjoyed a good reputation, the jurors might well have concluded, in view of the judge's attitude in the matter, that the witness was unworthy of belief. Certainly the injection of this irrelevant and highly prejudicial matter at the instance of the judge made it extremely difficult, if not impossible, for the jurors to give proper consideration to the testimony of the witness and to the character testimony as a whole. An improper cross-examination of a witness who testifies to a defendant's good character in a criminal case may be productive of much harm, as by the unwarranted suggestion that defen-

dant has been guilty of wrongful or criminal acts other than those with which he is charged, and where prejudice has resulted from such cross-examination, judgments of conviction have been reversed. (*People* v. *McDaniel* (1943), 59 Cal. App.2d 672 [140 P.2d 88].) Here we have much more than improper cross-examination of a character witness. Mr. Mills was obliged to assume the culpability of defendant in extraneous and irrelevant matters and then to either stand by his original answer or alter it and, in addition to that, there was discernible in the conduct of the judge his belief that the witness should change his testimony. The inevitable effect of all this was to deprive defendant of the right to have the character testimony weighed by the jury fairly, impartially and judicially.

It is well understood that cases of this type must be tried with the utmost fairness and impartiality in order that the defendant may receive a fair trial. Accusations such as were made by defendant's step-daughter of themselves arouse feelings of animosity and prejudice against the accused, and the testimony of the accuser in such cases frequently is, and in this case it certainly was, of such a nature as to depict the defendant as a depraved individual. In *People* v. *Adams* (1939), 14 Cal.2d 154, at 167-8 [93 P.2d 146], it was said: "In such a situation, the only defense available, ordinarily, to the accused is his own denial of any asserted misconduct, together with evidence of a former good reputation; otherwise, he is utterly defenseless and at the mercy of a jury which probably is very much prejudiced. . . . It is because of the recognized existence of the ease with which convictions of men, even those of unblemished reputation, may be secured in cases of the instant kind that courts are at pains to insist upon fair trials in all respects being accorded to the accused. Errors committed either by the prosecution or by the court in the course of the trial, which ordinarily might be considered trivial and as of no material consequence from a standpoint of adverse effect upon the rights of a defendant, may become of great importance when committed in a case of the character of that here involved." And in *People* v. *Putnam* (1942), 20 Cal.2d 885, it was said, at p. 891 [129 P.2d 367]: "It has long been recognized that there is no class of prosecutions 'attended with so much danger or which afford so ample an opportunity for the free play of malice or private

vengeance.' [Citing] *People* v. *Benson* (1856), 6 Cal. 221 [65 Am.Dec. 506]; *People* v. *Lucas* (1940), 16 Cal.2d 178 [105 P.2d 102, 130 A.L.R. 1485]; *People* v. *Adams, supra; People* v. *Baldwin* (1897), 117 Cal. 244 [49 P. 186]; and *People* v. *Vaughan* (1933), 131 Cal.App. 265 [21 P.2d 438].)'' Our courts have many times quoted *People* v. *Benson, supra,* to the same effect.

In determining whether error committed in a case of this sort has been sufficiently prejudicial to require a reversal, a reviewing court is in the difficult situation of having no opportunity to observe the prosecutrix and the defendant as witnesses in the case. It sometimes appears even from the printed record that a strong case of guilt was not made out, and in such a case it may be the clear duty of the court to reverse the judgment for errors which would not justify a a reversal in a case where guilt was clearly shown. But even if the evidence is not such as to show affirmatively that the case of the People was a weak one, it does not necessarily follow that it was a strong case. The verdict of guilt may have been rendered by jurors who were so strongly convinced of defendant's guilt as to have been entirely uninfluenced by errors or misconduct at the trial, or the scales may have been so evenly balanced as between the testimony of the complaining witness and that of the defendant that the errors or misconduct tipped the balance against the defendant.

We have carefully considered the entire evidence in order to determine whether there has been a miscarriage of justice. The prosecutrix had testified upon direct examination that an offense of rape was committed on February 10, 1943, in the living room of the home and she gave an explicit account of what took place. Upon cross-examination she testified as follows: "Q. BY MR. GLEASON: All right. Where were you that afternoon when this act occurred, that is, I am talking now about Wednesday, February the 10th? A. I don't really remember now whether it was upstairs or down in the house. Q. Do you remember how the act took place? A. No. I don't. Q. You don't remember any of the details about it? A. No, I don't. Q. You don't remember how you were dressed or how he was daressed, do you? A. He was dressed as usual in his work clothes. Q. Do you remember that? A. Yes, I remember that because I never saw him in the afternoon except when he was in his work clothes, except maybe on Tues-

day. Q. That is the only reason that you now say that he was dressed that way because that was his usual custom, is that it? A. Yes. Q. But you have no independent recollection that that was the way he was dressed on that occasion? A. No. Q. You could not remember now how you were dressed on that occasion? A. No, I don't. Q. Now, you don't remember anything about that particular act of intercourse other than you know it was an act of intercourse, is that it? A. That is right. Q. You don't remember whether you had the act standing up, sitting up or lying down or how? A. It was lying down; I know that. Q. How do you remember that? A. Because all of them were lying down. Q. You remember that because the acts you had in the past were always in a lying position? A. Yes. Q. So that is how you remember on this particular occasion that you were lying down? A. Yes. Q. But you have no independent recollection that you were lying down when you had this act of intercourse with him? A. No. Q. Do you remember— Do you have any independent recollection as to whether or not it was on the bed or on the floor? A. No. Q. Do you have any independent recollection whether it was under the covers or on top of the bed covers? A. I don't know if it was on the bed. Q. In other words, you don't remember anything about that particular act of intercourse? A. Not now, I don't. Q. And that was the day before Mr. Long was arrested? A. Yes. Q. And do you know whether you had more than one act of intercourse with him that day or just the one? A. Just the one. Q. And that was all that occurred, that is to say, was just one act of intercourse with the defendant, until your mother came home? A. That is right. Q. How long before your mother came home did this act of intercourse take place? A. I don't know. Q. How long after you got home from school did the act of intercourse take place? A. I don't know that either. Q. What time did you get home from school that day? A. 3:30. Q. How long did the act of intercourse take? A. I don't know. Q. Do you have any independent recollection now as to whether or not he removed your clothing on this occasion when he had this act of intercourse with you on February the 10th? A. No. Q. You then really don't remember or you have no recollection of what he did? A. I have no recollection of what he did. Q. In other words, you don't know whether he did take your clothes off or did not? A. That is right.'' She had testified at the preliminary ex-

amination to acts of the defendant in addition to those testified to at the trial, and when questioned about them by the court at the trial could not remember whether they had occurred. Such contradictions in the testimony of the witness did not necessarily prove her to be unworthy of belief, but they might well have raised serious doubts in the minds of the jury as to her credibility. The fact that the prosecutrix made no complaint to her mother as to defendant's frequent assaults upon her for a period of some three years, half of that time before her mother married defendant, was a circumstance that might or might not have led the jury to question the truth of her accusations. ■ There was ample evidence to sustain a guilty verdict reached after an unbiased and dispassionate consideration of the evidence, but this of course is not the test in determining whether there has been a miscarriage of justice.

In *People* v. *Wilson* (1913), 23 Cal.App. 513, it was said, at page 524 [138 P. 971]: ''The phrase, 'miscarriage of justice,' does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty. 'It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' '' Section 4½, article VI of the Constitution requires that convictions be affirmed notwithstanding errors at the trial, if it appears from the record on appeal that the errors were not of sufficient gravity as to probably have influenced the verdict. This situation may exist where the errors are not considered to be grave ones or, although the errors be serious, the evidence of guilt is yet so strong as to cause a reviewing court to believe that the result would have been the same if the errors had not been committed. But where grave error has been committed and the reviewing court cannot with a feeling of assurance say that without the error a conviction would have been had,

it becomes the duty of the court to reverse the judgment. (*People* v. *Degnen* (1925), 70 Cal.App. 567, 606 [234 P. 129]; *People* v. *Davis* (1930), 210 Cal. 540, 556 [293 P. 32]; *People* v. *MacPhee* (1914), 26 Cal.App. 218, 226 [146 P. 522]; *People* v. *Patubo* (1937), 9 Cal.2d 537, 543 [71 P.2d 270, 113 A.L.R. 1303]; *People* v. *Duvernay* (1941), 43 Cal. App.2d 823, 829 [111 P.2d 659]; *People* v. *Mahoney* (1927), 201 Cal. 618, 627 [258 P. 607]; *People* v. *Williams* (1942), 55 Cal.App.2d 696 [131 P.2d 851].)

It cannot be doubted that the court committed grave error in directing the use of the pictures in the cross-examination of the witness Mills. As we have said, the greatest harm came from the manifestation of the court's attitude toward the defense. Any conduct of the judge in a case of this nature which is susceptible of a reasonable interpretation by the jury that the judge is of the opinion that the defendant should be convicted cannot fail to have a potent influence on the jury. Where the question of guilt or innocence depends upon the jury's appraisal of the credibility of the accuser and the accused, which is frequently one of great difficulty, any conduct or remarks of the judge evidencing a departure from an attitude of strict impartiality and evidencing belief or disbelief of the testimony of the prosecutrix or of that of the defendant or his witnesses cannot fail to have a persuasive effect upon the minds of the jury. We believe the court's attitude in the instant case was such as to cast discredit upon the character evidence introduced by the defendant. This evidence was substantially all the defendant had to offer in his defense, in addition to his own denials. It was legitimate testimony and it was given by witnesses who were not shown to have had any motive to testify untruthfully. If given proper consideration by the jury, it might have been sufficient, with other beliefs reasonably based upon the evidence, to raise a reasonable doubt in the minds of the jury that defendant was guilty of the acts charged.

We are of the opinion that the prejudice resulting from the error we have discussed was more grave and harmful than would have been the failure to give a cautionary instruction, which has been held to be reversible error in cases of this sort where there is slight, if any, corroboration of the testimony of the prosecuting witness, and the court is not satisfied that the verdict would have been the same if the instruc-

tion had been given. (*People* v. *Putnam* (1942), 20 Cal.2d 885, 889 [129 P.2d 367]; *People* v. *Vaughan* (1933), 131 Cal. App. 265, 273 [21 P.2d 438]; *People* v. *Williams* (1942), 55 Cal.App.2d 696, 700 [131 P.2d 851].) The court's direction of the cross-examination, with its obvious implications, not only tended to discredit the testimony of the character witnesses for defendant but was such as to practically foreclose his chances of an acquittal. We are not satisfied that without the error a conviction would have been had.

The judgment and order denying motion for new trial are reversed.

Desmond, P. J., and Bishop, J. pro tem., concurred.