[Crim. No. 5769. Second Dist., Div. Two. Apr. 26, 1957.]

THE PEOPLE, Respondent, v. EARL E. BLACK, Appellant.

Kaiser & O'Neill for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Roy A. Gustafson, District Attorney (Ventura), and Albert J. Holzhauer, Chief Criminal Deputy District Attorney, for Respondent.

ASHBURN, J.—Defendant appeals from judgments of conviction upon five counts of incest committed through intercourse with his minor daughter, Carol Ann Black, on June 2, 1955, December 13, 1955, December 15, 1955, December 26, 1955, and January 7, 1956. The evidence showed that such acts began in 1952, when she was 11½ years of age, and continued at intervals until ended by her pregnancy

at the age of 15 years and by defendant's ensuing arrest. A first trial was had upon an information making the single charge of a crime committed on January 7, 1956. The jury disagreed. During that trial evidence of the acts committed upon the 1955 dates above mentioned was disclosed, and after the mistrial an indictment was procured charging those additional crimes. The information and indictment were consolidated for trial, which resulted in conviction upon all five charges.

Appellant's present counsel make no claim of insufficiency of the evidence for the obvious reason that there was a square conflict therein. The daughter, Carol Ann Black, testified to each of the alleged acts and defendant flatly denied them. At no stage of the case has he admitted guilt. His claim on appeal is twofold, (1) that there was prejudicial error in the exclusion of certain evidence, and (2) that there was misconduct on the part of the trial judge, directed at defendant and his counsel, which worked a miscarriage of justice. We are persuaded that the last mentioned ground is meritorious.

Most of the objectionable animadversions of the trial judge grew out of defendant's efforts to introduce evidence which, generally speaking, related to various types of delinquency on the part of the complaining witness without approaching the level of proof of intercourse with anyone other than the father. Mr. Wallace Hatcher (now deceased) had been assigned by the court the task of defending Black, who averred himself to be without funds. Mr. Hatcher, so far as the record shows, was respectful toward the court and reasonably tractable to suggestions from that source. He clung as best he could to an untenable theory of admissibility of the evidence in question but the basis of his argument seems to have been poorly defined in his own mind and he was therefore inept in its presentation as well as in other matters. The judge took a captious attitude toward him which made the presentation of his ill-defined views unnecessarily difficult for him.

Early in the trial counsel in cross-examination of Carol asked: "Is it your testimony, Carol, that you stayed out all night without ever having anybody have intercourse with you? A. That's true." The court overruled an objection and then added: "You say, 'Is it your testimony?' What does that mean? The jury has heard her testimony and now you ask her what her testimony is. MR. HATCHER: Well, I will just frame it in a different way, your Honor." Shortly after that, in examination of the same witness, the

following occurred: "Q. Now, is it your testimony, Carol, that you say you never had any act of intercourse with anyone besides you—— The Court: She testified and the jury have heard it and you are asking her: 'What is your testimony?' It is an improper question. Why not ask her directly? Mr. Hatcher: Q. Is that your testimony, that you never had acts of intercourse—— The Court: Don't answer the question. Mr. Hatcher: I am sorry, your Honor. The Court: The testimony of the girl is in. The jury have heard it." ██ There was nothing really objectionable about these questions; counsel has a right within reasonable limitations to choose the language of his own inquiries. The judge's attitude reflected more of irritation than a quest for the truth.

On another occasion counsel was reproved for calling his own client "Earl" and was directed to do so no more: "Q. Where were you stationed overseas, Earl? A. Antigua, British West Indies. The Court: When you say 'Earl', you are referring to the defendant, are you? Mr. Hatcher: Yes, Earl E. Black. The Court: Mr. Black? Mr. Hatcher: Earl E. Black. The Court: Well, I think perhaps you better use his name. Call him 'Mr. Black' rather than become so familiar. It is hardly the place for it, I think."

This is one of those cases in which the charge is easily made and difficult to refute for the reason, among others, that the nature and fact of accusation are so revolting as to inflame the minds of ordinary men. The complaining witness, then about 15½ years old, was five months pregnant when on the witness stand. Having no direct proof that any other person was father of the expected child defendant was driven to an attempt to establish the fact by circumstantial evidence. (While parentage was not the legal issue, it would loom large in the mind of each juror.) When counsel apparently was trying to build up from "dating of boys" to direct or circumstantial proof of intercourse outside the family circle, the following occurred in cross-examination of Mrs. Eleanor I. Black, divorced second wife of defendant: "Mr. Hatcher: Q. Did Carol talk to you, Mrs. Black, at any time about her sex affairs or—— The Court: You mean actual sexual conduct with males? Mr. Hatcher: Well, her dating of boys? The Witness: Yes. Mr. Holzhauer: Object to that as incompetent, irrelevant and immaterial. The Court: Oh, I think this is very unfair for you to assume that her dating boys amounts to something in the nature of sexual activities.

MR. HATCHER: Your Honor—— THE COURT: Have you proof of any such fact? MR. HATCHER: Your Honor, I think those remarks are improper. THE COURT: Well, it is immaterial to me whether you think they are improper or not. MR. HATCHER: I am just making the record. THE COURT: I am not going to permit you by intimation to beat this girl down unless it is proper. MR. HATCHER: And I don't have that intention. THE COURT: When you talk about relations with boys and assign it as sexual activity, you are obviously misleading. MR HATCHER: I have no intention of doing that, your Honor. THE COURT: Well, then, watch your language. Let's frame the question so that that will obviously not be your purpose. MR. HATCHER: I take it—— THE COURT: You asked this lady about the girl's discussions with her or her sexual activities with boys. It presumes one thing, does it not? MR. HATCHER: I take it that we are entitled to show her activities. THE COURT: You are entitled to do it properly. Now, let's proceed from this point forward to do it properly, if you don't mind. MR. HATCHER: I am doing the very best I can, your Honor. THE COURT: You can do better, and you must do better. Now, let's proceed with the orderly trial of this case in the proper manner. You are familiar with what is proper and what is not, I am sure, but if you are not, I propose to tell you as we go along. MR HATCHER: I would like to make an objection as we go along in the record, just for the purpose of the record, to the Court's remarks. Mrs. Black—— THE COURT: All right. Now, you better do that properly. You are assigning my remarks as being misconduct, are you not? MR. HATCHER: Yes. THE COURT: And improper and you are moving now, because if you don't, you see, it will get you nowhere, you are moving for a mistrial on the ground that I have improperly ordered you not to use language which by implication assumes that this girl did have sexual relations with boys. Now, isn't that your—— MR. HATCHER: No, your Honor. THE COURT: — position? MR. HATCHER: That wasn't my purpose. THE COURT: All right, let's get along. I have made your record for you. Let's get along with the trial of this case and let's do it properly. And I might add that this is the last time I am going to admonish you on this subject. MR. HATCHER: Very well, your Honor, I will conduct it as best I know how. THE COURT: You will do better than you have been doing, I assure you, or there will be trouble. I have warned you, as I say, for the last time.''

 Though counsel's line of inquiry was objectionable (*People* v. *Wilson*, 79 Cal.App. 709, 713 [250 P. 879] ; *People* v. *Stratton*, 141 Cal. 604, 607 [75 P. 166]), and the ruling essentially proper, the judge's remarks were inescapably prejudicial. Counsel was accused of unfairness and told that he would not be permitted "by intimation to beat this girl down unless it is proper." The whole defense was that the girl was telling a falsehood and this remark undoubtedly conveyed to the jurors a judicial stamp of approval upon her story. There was nothing wrong with the form of the question "Did Carol talk to you, Mrs. Black, at any time about her sex affairs or . . . her dating of boys?", but the judge termed it unfair and further said: "When you talk about relations with boys and assign it as sexual activity, you are obviously misleading. MR. HATCHER: I have no intention of doing that, your Honor. THE COURT: Well, then, watch your language. Let's frame the question so that that will obviously not be your purpose." The judge himself raised the matter of misconduct on his part and concluded with the threat of dire consequences if his admonitions were not heeded. The whole incident was precipitated by the judge, was highly improper and inevitably prejudicial to defendant because of obvious bias in favor of the complaining witness and disapproval of the halting efforts of defendant's counsel.

When the defense attorney was trying to qualify a 13-year-old girl as a witness, and having little success, the court asked her: "Aside from this idea of God punishing you if you failed to tell the truth here, what penalties or punishment are imposed; do you know?" She replied: "God would punish me and so would my mother." Of course no child of that age would be likely to answer the judge's question. Mr. Hatcher asked: "Do you know that it is in violation of the law to tell a falsehood, too?" She replied in the affirmative and then the court said: "I think that it is quite obvious that the girl knew no such thing but she will answer your leading questions." This stricture upon counsel's questioning was improper; the circumstances rendered it not inappropriate for him to lead the child after the court had put to her a question of law obviously impossible for her to answer.

At the first trial Carol testified that her father stopped at a motel in Needles when driving her to the East, and that he there had intercourse with her. Defendant denied that they had stopped at a motel in Needles or any other place. Between the two trials the officers aided the girl in locating the

motel which was in Barstow, not Needles, and they there found the register bearing defendant's signature. When proof along that line was tendered Mr. Hatcher said: "Your Honor, I object to this testimony. We have admitted and have always stated that they stayed at Barstow." And the court asked: "Do you mean by that, that you admit that the girl made a mistake, and an honest one?" Again the judge advised the jury of his belief in the honesty of the complaining witness.

Carol testified that defendant, upon his return from the Leeward Islands on December 13, 1955, found her alone in the house, told her he had not seen a white woman since the latter part of October, demanded and had intercourse with her. In an attempt to impeach her on this point counsel asked a defense witness: "State whether or not there were any white women at the Leeward Islands where you were stationed? A. Yes, sir." Objection being made, the following occurred: "MR. HOLZHAUER: Well, your Honor, in any event it is certainly a collateral issue. MR. HATCHER: He saw fit to bring it up and I want to impeach the witness on that. THE COURT: All right. Overruled. MR. HATCHER: I don't want to ask for any evidence I am not entitled to. THE COURT: Let's get along. I am going to rule on objections as we go along and I would appreciate it if you would make no further remarks of this sort at all. I am perfectly aware of your purpose and I am ordering you to desist. I will rule on the objections in the usual, orthodox way. MR. HATCHER: Very well, your Honor. THE COURT: I need no comment on your intent or purpose. None. Let's proceed."

The Canons of Judicial Ethics adopted by the Conference of California Judges contain the following: "A judge should be temperate, attentive, patient, impartial. . . . A judge should be courteous to counsel, especially to those who are young and inexperienced, and also to all others appearing or concerned in the administration of justice in the court. . . . A judge may properly intervene during the trial of a case where this appears reasonably necessary in order to expedite proceedings, for clarification of any point, or to prevent injustice. He should remember that while, primarily, it is the function and right of attorneys to present the case of their respective clients, it is the ultimate function of the judge to see that no party appearing before him suffers an injustice which he can prevent. Litigants, witnesses and attorneys alike are entitled to have a court function as a court of justice in fact as well as in theory. In exercising the firmness necessary to the

dignity and efficient conduct of court proceedings, a judge's attitude should not reflect undue impatience or severity toward either counsel, litigant, or witnesses. . . . Justice should not be moulded by the individual idiosyncrasies of those who administer it. A judge should adopt the usual and expected method of doing justice, and not seek to be extreme or peculiar in his judgments, or spectacular or sensational in the conduct of the court. . . .'' The rudeness exhibited in the above quotations from the record was far removed from the standards of conduct resting upon trial judges, voluntarily imposed upon themselves in the interests of substantial justice. (See also *Etzel* v. *Rosenbloom*, 83 Cal.App.2d 758, 765 [189 P.2d 848].)

Toward the end of the trial the deputy district attorney asked Carol: ''Carol, I want you to tell this jury just how you feel about your father.'' Defendant's counsel objected and the court said: ''Overruled. You see, you have assumed that the girl is telling a story. Your tone of voice indicated it and everything else. Now you can't beat her down and then prevent her from explaining an answer to a question like that. Overruled. MR. HATCHER: Your Honor, I don't mean—— THE COURT: Overruled. I don't want any argument about it. We have had enough of this sort of unusual conduct in this case.'' Of course counsel had assumed that the girl was telling a false story and it was his duty to prove it, if possible, by direct or indirect evidence. There was no impropriety in such assumption on his part. ''Now you can't beat her down'' plainly implies sympathy for the girl and criticism of the attorney. The remark, ''Now you can't beat her down and then prevent her from explaining an answer to a question like that,'' was misplaced. The question put to her by the prosecutor did not call for an explanation of any answer she previously had given. Counsel for defendant had made no attempt to show that she was hostile to her father or prejudiced against him. The court's remarks were without good cause and plainly critical of the efforts of counsel. The overall effect of the many strictures upon his way of presenting the case was an obvious distrust of his motives and purposes, which the jury could not miss and which the record did not justify. Ignorance or ineptness does not spell lack of probity and the jury should not have been given the impression that they do.

There were numerous other instances of mistreatment of defendant's attorney, though not so aggravated as the ones above mentioned.

Carol testified that her father knew she had missed her menstrual period before he left for the West Indies and had asked her to write him when she learned whether she was pregnant; also that he told her that if she was found to be so she should say that she had been raped by an unidentified stranger. When on the witness stand he had denied this and had said he first heard of her pregnancy in a letter in which she told him of the rape. On rebuttal Carol, being on the witness stand, testified as follows: "Mr. HOLZHAUER: Q. What did you tell your father when you wrote that letter? A. I told him what happened Sunday and why I was staying at the Ericksons and I told him that Thursday or Friday I went to the clinic and took the frog test and the following Monday I would know if I was pregnant or not. I also told him that I had told the story that he had told me to tell, if anyone should ask why I was pregnant." The trial was almost over; the defense had failed in its effort to point the finger of paternity at anyone but defendant; all the breaks had been against him; his attorney had been berated repeatedly in the presence of the jury; he must have realized that the prison doors were opening before him, and out of his particular hell issued this desperate cry: "Carol, you know that is a lie." The judge, on motion for new trial, referred to it as "bellowing" and his own attorney as an "outcry." Loud it may have been, for it issued from a soul in agony, and it was met by unusual severity. The judge represented all the authority of the State; Black was but a lone defendant, his attorney not even allowed to call him "Earl"; and the court laid on the whip of authority without restraint. Immediately following defendant's exclamation this occurred: "THE COURT: If that happens once more—look at me, sir. If that happens again in the course of these proceedings, you will regret it. You know better than that. Mr. Bailiff, gag this man if there is any necessity for it. Do you want to sit here with a gag in your mouth? THE DEFENDANT: No. sir. THE COURT: You know better than to do a thing like that. Don't let it happen again. And I would suggest that it might be better for you to cease your staring at her continuously also. All right. The jury will disregard entirely the statement that was last made by the defendant. It was unwarranted and it has no place in these proceedings or in this courtroom at all." Not once in four days of trial had defendant given previous offense in any way; not once had he transgressed the rules of decorum which normally

govern a trial. There was no justification or excuse for this outburst on the part of the judge. The jury could only have gotten the impression that the judge was unalterably set against defendant and his case.

This court, in reversing because of misconduct of the trial judge, said in *People* v. *Williams,* 55 Cal.App.2d 696, 703 [131 P.2d 851]: "There is never an instance which justifies a trial judge or counsel in being discourteous one to the other, to witnesses, parties litigant, or jurors. Judges presiding at a trial should conduct the trial in a fair and impartial manner and refrain from making any unnecessary comments or remarks during the course of the trial which may tend to a prejudicial result to a litigant. Remarks such as those made by the trial judge in the instant case and in the cases cited above tend to bring the administration of justice into disrepute and serve as a basis for appeals. Such remarks deflect the minds of jurors from the evidence actually before them and cause them to reach conclusions based upon feeling, bias, and prejudice, rather than upon the evidence which has been properly received and from which alone they should arrive at verdicts under the law." The Supreme Court, in *People* v. *Sarazzawski,* 27 Cal.2d 7, 11 [161 P.2d 934], said: "When a defendant has been denied any essential element of a fair trial or due process, even the broad saving provisions of section 4½ of article VI of our state Constitution cannot remedy the vice and the judgment cannot stand. [Citations.] That section was not designed to 'abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering "justice" in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' " *People* v. *Lyons,* 47 Cal.2d 311, 324 [303 P.2d 329]: "[In the circumstances the conviction cannot be supported by section 4½ of article VI of the state Constitution, for the denial of a fair trial is a miscarriage of justice. (*People* v. *Sarazzawski* (1945), 27 Cal.2d 7, 11 [161 P.2d 934]; *People* v. *Hooper* (1949), 92 Cal.App.2d 524, 531 [207 P.2d 117]; *People* v. *Mason* (1946), 72 Cal.App.2d 699, 716 [165 P.2d 481].)]" To the same effect, see *People* v. *Ma-*

*honey,* 201 Cal. 618, 623, 626 [258 P. 607]; *People* v. *McKay,* 37 Cal.2d 792, 798 [236 P.2d 145].

Because defendant did not have a fair trial the judgment must be reversed. In view of the necessity of a further trial, we also address ourselves to appellant's claim of error in excluding evidence.

The judge's exasperation with defendant's attorney seemed to stem from his own uncertainty about the admissibility of the evidence in question. Defendant sought to show that, beginning at the age of 7, more than four years prior to the alleged incest, Carol was incorrigible in various ways,— instanced by testimony that beginning at the age of 7 she would drop and break dishes when asked to clear the table; would wet the bed when not permitted to listen to the radio; that in later years she would absent herself from school; ran away from home on numerous occasions; stole clothes from her school; was in juvenile court some six times; committed to a parochial school on one occasion; had boy friends in the car and sitting with her on the couch for hours. It is now contended that the purpose of presenting this evidence, originally received and later stricken, was to show motive and bias on the part of Carol prompting her to falsely blame her father for her condition. The record shows, however, that trial counsel in his efforts to formulate a theory of admissibility never hit upon this one. Hence appellant is in no position to urge the point. "The materiality or relevancy of the question asked of the defendant was not apparent, and counsel for the defendant did not attempt to explain the purpose of the question or offer to show how an answer might be relevant. In the absence of such a showing no prejudice appears." (*People* v. *Carmen,* 43 Cal.2d 342, 347 [273 P.2d 521].) To the same effect are *People* v. *Reyes,* 194 Cal. 650, 652 [229 P. 947]; *People* v. *Brown,* 43 Cal.App.2d 430, 433 [110 P.2d 1059].

Initially counsel seems to have had the theory that Carol was a congenital and pathological prevaricator. Then he shifted to a theory of destroying credibility through showing a "pattern of conduct" of general delinquency. This was rejected by the judge who ruled as follows: "THE COURT: All right, I will permit the evidence to be introduced on the theory that it again indicates or tends to indicate the girl may have such a personality that she is unable to tell the truth or the difference between truthfulness and untruthfulness. For that limited purpose you may answer. MR. HATCHER:

I wasn't offering it for that purpose. THE COURT: I know. I am telling the witness that he may answer for that purpose." Ultimately the judge changed his mind and struck all such testimony. There was no prejudicial error in any of this, for the evidence was not admissible in the first place and properly was stricken. The issue was, did defendant have intercourse with his minor daughter? Unchastity of Carol with respect to other men was not in issue, nor was paternity of the child. Consent or nonconsent to the father's acts was likewise aside from the issue. That is not to say that conduct with other boys which would tend to prove directly or circumstantially the fact of intimacy with them would not be admissible, for proof that Carol had had intercourse with some person other than defendant was a practical necessity to his defense by way of corroboration of his denial of the charges against him. But the evidence at bar did not rise to that level and counsel did not claim that it did. That the evidence was properly stricken follows from such cases as *People* v. *Wilson, supra,* 79 Cal.App. 709, 713; *People* v. *Stratton, supra,* 141 Cal. 604, 607; *People* v. *Burrows,* 27 Cal. App. 428, 431 [150 P. 382] ; *People* v. *Kruvosky,* 53 Cal.App. 744, 751 [200 P. 831] ; *People* v. *Murphy,* 53 Cal.App. 474, 481 [200 P. 484] ; *People* v. *Nichols,* 2 Cal.App.2d 99, 101-102 [37 P.2d 710] ; *People* v. *Adams,* 76 Cal.App. 178, 185 [244 P. 106].

The judgments of conviction are reversed.

Moore, P. J., and Fox, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 19, 1957.