[Crim. No. 582.  Second Appellate District.—February 8, 1918.]

THE PEOPLE, Respondent, v. JOHN VOGEL, Appellant.

CRIMINAL LAW — MURDER — EVIDENCE — ACCUSATION BY DECEASED — DENIAL BY DEFENDANT.—In a prosecution for murder, testimony of witnesses that the deceased shortly before his death accused the defendant of the commission of the crime, which the defendant denied, is inadmissible.

ID.—SUSPICION OF COMMISSION OF CRIME—HEARSAY.—In such a prosecution, testimony of one of the witnesses to the accusation that he had been previously informed that defendant was under suspicion, and who had so informed him, is inadmissible, as hearsay.

ID.—IMPEACHMENT OF EXPERT—TESTIMONY IN ANOTHER ACTION—PROOF BY STENOGRAPHIC REPORTER.—In such a prosecution, where the defense sought to impeach the opinion evidence of a witness for

the state as to how long the odor of burnt powder could be detected in a discharged weapon, by showing that he testified differently in another action, the court reporter was a proper witness as to such testimony and had the right to use her stenographic notes to refresh her recollection.

ID.—MISCONDUCT OF COURT—PREJUDICIAL REMARK.—The statement of the trial judge, after examination of the stenographic reporter's transcript, that he found nothing in it to impeach the testimony of the witness, was uncalled for, and prejudicial to the rights of the defendant.

APPEAL from a judgment of the Superior Court of Imperial County, and from an order denying a new trial. Franklin J. Cole, Judge.

The facts are stated in the opinion of the court.

Willson & Stensland, for Appellant.

U. S. Webb, Attorney-General, Robert M. Clarke, Deputy Attorney-General, and R. B. Camarillo, for Respondent.

WORKS, J., *pro tem.*—The appellant was convicted of murder in the first degree and was sentenced to life imprisonment. The appeal is from the judgment and from an order denying a motion for a new trial.

The crime for which the appellant is sought to be punished was in the shooting of one Joe Ming, the occurrence having taken place near El Centro. Ming operated a dairy and Vogel was employed by him as a milker. Both the men were Swiss and had been acquainted at least as long as Vogel had been in the United States, a period of six years. Vogel had been employed by Ming for eighteen months and they had been friends the entire time. Several other persons, including Ming's wife, were regularly on the ranch, and they all testified that not only had there been no trouble between the men on the day of the shooting, but that there had never been trouble of any kind between them. Ming himself stated, within a short time after he was shot, death not resulting from his wound until more than thirty-six hours had passed, that he had never had any trouble with Vogel and that they had always been friends. The record shows no motive whatever for the commission of the crime by Vogel.

The shooting occurred in the early evening. Ming had left the ranch-house immediately after dinner for the purpose of irrigating a certain field on the ranch. His wife and several others remained in the house listening to a phonograph. Vogel was not among them, he having left the house from half an hour to an hour before Ming was shot. He says he went to a certain bunk-house which was on the ranch and retired to bed, not caring to hear the phonograph, of which he says he had become tired. · Those in the ranch-house heard a shot in the direction in which Ming had gone, and also heard someone cry out. Mrs. Ming, a boy of about sixteen, and a man, one Zeno Burch, ran in the direction of the sounds, the boy reaching Ming first, then Mrs. Ming and then Burch. Ming was walking or standing in the field at a point about two hundred yards from the ranch-house. The boy asked him what was the matter and he responded that somebody had shot him. He was immediately helped toward the house by the three who had come to his relief, but said nothing to any of them, either on the way to the house or after he was gotten to bed, as to who had fired the shot. As soon as Ming was placed on the bed, the boy who had helped him to the house, accompanied by another ·boy, went to the bunk-house where they found Vogel in bed and entirely undressed. The boys told Vogel that Ming had been shot and he said, "You are just kidding me." He was told that the statement was true, whereupon he dressed, except that he remained barefoot, and went to the house. He entered the room where Ming lay and had a conversation with him. They were seen talking together by at least two witnesses, but the conversation was so quiet that it was not overheard, except to the extent that Zeno Burch testified that he heard Vogel answer "Yah," as the reporter writes it, to something said by Ming. In response to telephone call, three or four deputy sheriffs arrived at the ranch from half an hour to an hour after the shooting occurred. It was after their arrival that Ming made the statements referred to in the bedside conversation mentioned below. Up to that moment he had said nothing as to who had committed the crime upon him.

Aside from the bedside conversation, and a dying declaration made by Ming in an automobile as he was starting from the house to a hospital, the evidence against Vogel was entirely circumstantial. Ming's wound, which was in the upper

part of the abdomen, was inflicted by a twenty-two caliber bullet. He was the owner of a rifle of that caliber, which was used indiscriminately by those on the ranch, including Vogel. The latter was seen cleaning the weapon during the day, at about 10 or 11 o'clock. Kemp, one of the deputy sheriffs, says Vogel told him he had been shooting the gun all day. Kemp testifies, from an examination of the rifle after the shooting, that it was not discharged more than once or twice after it was last cleaned. It was kept sometimes in the ranch-house and sometimes in the bunk-house. On the day and evening of the shooting it was at the latter place. In addition to the circumstantial evidence already stated, Zeno Burch gave testimony that, as he proceeded after Mrs. Ming and the boy upon hearing the shot and the cry, he saw a man, whom he does not identify, move rapidly in a direction from the place where Ming was and toward the bunk-house. This man was near the bunk-house at the time, and Burch says he saw him moving for a distance only of fifteen or twenty feet, the place at which Ming was found after the shooting being several hundred feet from the bunk-house. In a part of his testimony Burch says the man was walking rapidly. In another part he says he was running. On account of obstructions to his view, Burch could not see the door of the bunk-house, but he says he did not see the man pass beyond that structure. It may be remarked here that the night was brightly lighted by the moon. The deputy sheriffs found some footprints in the neighborhood of and leading from near the scene of the crime and toward the bunk-house, and they testified that a pair of Vogel's shoes fitted them. The shoes were of a medium size, one witness having testified that they were about number six and a half, another that they were about eights. In making this statement of the circumstantial evidence in the record, we have placed it in the light most favorable to the case of the prosecution; and have refrained from stating evidence opposed to some of it and from stating hypotheses upon which the effect of some of it might be explained away.

The record contains testimony by the witnesses Zeno Burch, Cummings, Cleveland, and Kemp to the effect that Ming, while lying in bed after the shooting, accused Vogel of the crime. The appellant made motions to strike out the testimony of these witnesses upon this subject, but the trial

court denied the motions and permitted the evidence to stand. The testimony of Burch, who was another Swiss and did not speak English well, was that Ming pointed at Vogel and said, "That is the man there," and that Vogel answered, "I don't shot." Cummings testifies that Ming, pointing toward Vogel, said that was the man that killed him, that was the man that shot him, and that Vogel responded only with a certain contemptuous and unprintable expression, which to our minds, however, was equivalent to a denial of the accusation. Cleveland has it that Ming said, indicating Vogel, "That is the man who shot me, that is the man that killed me," and that Vogel answered with the contemptuous expression already mentioned. Kemp was the nearest to Ming when these occurrences took place. He testifies, "I asked him if he knew who shot him and I was leaning over him, and he grabbed my arm and raised himself up in the bed and said 'That is the man that shot me, that is the man that killed me.' Ming seemed to be suffering and I laid him back in the bed and Mr. Cummings and Cass and Cleveland and myself and two or three others were in the room and I walked around to where this defendant was and asked him to come with me. Before I could get to him, he was protesting against Ming accusing him. He said he could not have done it and what reason did he have to do it and he was out in the bunk-house asleep." Kemp's request to Vogel to come with him is explained by the fact that the former was a deputy sheriff, as also were Cummings and Cleveland.

The appellant's motion to strike the testimony of these witnesses was based on the rule stated in *People* v. *Teshara,* 134 Cal. 542, 544, [66 Pac. 798, 799]. In that case the defendant was on trial for the murder of one Loucks. Before the latter died he accused the defendant of having inflicted his injuries upon him. The court said: "The court erred in refusing to strike out the evidence of Patton and Mullen as to the accusation made by Loucks, when Amaya and defendant were brought to his bedside. The statement made by Loucks at that time was hearsay, and Teshara made no admission of its truth, either expressly or tacitly. He expressly denied it. The court and the district attorney seem to have lost sight of the fact that it is not the accusation, but the conduct of the accused, that is evidence in such cases, and that the only reason for admitting the accusation is to ex-

plain the conduct. The district attorney should not have offered this evidence, knowing, as he did, that Teshara had not remained silent under the accusation, but had repelled it at the time it was made."

The respondent insists that *People* v. *Teshara* has no application in this case, and that the motion to strike was properly denied under *People* v. *Turner*, 1 Cal. App. 420, [82 Pac. 397], and *People* v. *Cole*, 141 Cal. 88, [74 Pac. 547]. In the first of these cases the court said (1 Cal. App. 422, [82 Pac. 398]), in dealing with the question of the admissibility of such accusations: "Even where the defendant flatly denies the criminal act, yet if he goes on to make exculpatory statements, for instance, as to his whereabouts at the time, and these statements can be shown to be false, then the statements, together with their falsity, may be shown on the theory that falsehood in the matter is an indication of conscious guilt. In such a case, it is the falsehood only that tells against the defendant."

The point now before us is governed by *People* v. *Teshara*, unless it be for the testimony of the witness Kemp to the effect that Vogel said he was out in the bunk-house asleep when the crime was committed. It will be noted, however, that Kemp does not ascribe to Vogel the making of this statement immediately upon the making of the accusation. After Ming made the charge Kemp saw that the injured man was suffering and laid him back in the bed. As Ming was shot in the abdomen Kemp naturally let him down carefully, taking some appreciable time in performing the act. After that was done he started toward Vogel, and it was as he was on his way that he attributes to Vogel the making of the remark about his having been asleep in the bunk-house. Moreover, Burch, Cummings, and Cleveland all testify to what was said by Vogel in direct response to Ming's accusation, and neither of them imputes to him any remark like the one mentioned by Kemp. They were all nearer to him than was Kemp when the accusation was made. It appears, then, that by what Vogel said in immediate response to the accusation he repelled it and did not seek to exculpate himself or to explain. The cases of *People* v. *Turner* and *People* v. *Cole* of course mean that a person accused of crime must, immediately upon the accusation, make the "exculpatory statements" which the opinions in those cases determine will entitle the

conversation to be received in evidence. The accused person cannot be expected to continue long to rely alone upon his denial. If innocent, he will follow the accusation with instant repudiation and will be satisfied to so leave the matter for a brief interval; but, even if innocent, his mind will quickly go to matters which will justify and sustain the denial before the world. Denial is not proof, and he will almost immediately begin to think of proof; and it will not be strange if his statements reflect the condition of his mind. We are satisfied that the point is ruled by *People* v. *Teshara*, and not by the other two cases. Not only the disposition of the motion to strike Kemp's testimony depends upon what we have just said, but also the motions to strike the testimony of Burch, Cummings, and Cleveland. They all testified before Kemp, and there was a motion to strike the testimony of each concerning the bedside accusation as that testimony was given by each, but counsel for defendant himself asked that a ruling on all the motions be reserved, and he did not finally insist upon them until Kemp had testified and the prosecution was about to rest its case.

After Cummings had testified to the occurrences at Ming's bedside the district attorney asked him if, up to that time, he had been informed that Vogel was under suspicion for having shot Ming. The question was objected to but the objection was overruled. Cummings answered that he had. He was then asked who had made the statement to him and, over an objection to the question, he was permitted to answer that it was Zeno Burch. These rulings were both erroneous. The questions called for nothing but hearsay evidence and should have been ruled out for that reason. This error was most damaging to the appellant's case, as there is nothing in the record, except the testimony of Cummings on this point, which fastens any suspicion whatever upon Vogel before the time of the conversation at the bedside of Ming.

The witness Kemp had examined the bore of the rifle already mentioned, testified to its condition and also testified, from the odor of burnt powder about the weapon, that it had been fired, in his opinion, within a period of thirty minutes or an hour preceding the time of his examination of it. The period mentioned by him would cover the time of the shooting of Ming. The defense sought to impeach this opinion evidence of Kemp by showing expert testimony given

by him in another action upon the question as to how long the odor of burnt powder would remain in a gun after its discharge. When he was on the stand Kemp was asked whether or not he had testified in the other action ''that the odor of a discharged weapon would last as long or longer than twelve hours,'' and he answered that he had not. In the present action, the court reporter who had taken Kemp's testimony in the other case was examined and was asked whether he had then testified that the smell of burnt powder could be detected in a discharged weapon twenty-four hours after the discharge. An objection to the question was sustained and the ruling was correct, as the time fixed by the inquiry was different from that embraced in the impeaching question which had been addressed to Kemp. The court, however, appears to have sustained the objection for a wrong reason and, while that fact does not affect the propriety of the ruling, the circumstance is necessary to be stated in order to explain what followed. The district attorney had objected to the question on the general grounds, adding the specific objection that the record was the best evidence. When the objection was sustained the appellant's counsel asked the reporter to produce her record. She asked whether it was her notes or the transcribed testimony that was wanted. The district attorney responded that it made no difference to him, and counsel for appellant then asked the reporter to produce the transcript; whereupon the district attorney objected to ''any testimony along this line, for the reason that there was no foundation laid; that the exact question and answer, which the defendant seeks to have read to the jury'' had not been previously read to Kemp. After some argument, during which appellant's counsel stated, in effect, that he expected to show by the reporter, with the transcript to refresh her recollection, that Kemp had testified in the earlier case that the odor of a discharged gun would remain in it more than twelve hours, the court sustained the district attorney's very general objection on the ground that what the transcript showed by way of question and answer had not been exhibited to Kemp. Not only that, but he examined the transcript himself and stated to the jury that ''the evidence in the transcript which has been produced, I do not consider as impeachment.'' Counsel for appellant then offered to prove by the court reporter, she to use her stenographic notes or

the written transcript to refresh her recollection, that Kemp had testified in the previous action that the odor would remain in a gun more than twelve hours after its discharge. There was no objection to the offer, but the court, evidently understanding that one had been made, said that he would sustain the objection, and the evidence was not received. These various rulings were erroneous. The court reporter was a proper witness to testify to statements made by Kemp at the trial at which she had acted as reporter, and she could have used her stenographic notes to refresh her recollection, as notes or memoranda made by her at the time to which her testimony related. (Code Civ. Proc., sec. 2047; *People* v. *Ammerman,* 118 Cal. 23, [50 Pac. 15]; *People* v. *Sexton,* 132 Cal. 37, [64 Pac. 107].) Further, under the statement of the district attorney that it made no difference to him whether she produced her original notes or the transcript made from them, she could have refreshed her recollection from the transcript. We have pointed out the error into which the trial court fell in its rulings upon this question, but, in addition, we are impelled to direct attention to the action of the court in stating, after he had examined the reporter's transcript, that he found nothing in it to impeach the testimony of Kemp. His action in that regard was uncalled for. It was no more within his province to pass judgment upon the effect of the matter contained in the transcript than it would be for him to take the same attitude concerning any private memorandum which any witness was about to use for the purpose of refreshing his recollection under the terms of section 2047 of the Code of Civil Procedure. His statement was distinctly prejudicial to the rights of the appellant.

There are many other errors which the appellant contends were committed by the trial court, but we have not found it necessary to determine whether the contentions be well founded.

We have made a careful examination of the entire cause, including all the evidence, in order to determine, under the language of section 4½ of article VI of the constitution, if it can be said that the errors above pointed out have not resulted in a miscarriage of justice. We have above made an unusually full statement of the facts of the case in order to furnish a background for the consideration of this question. We are impelled to say, from our examination of the

record, that a miscarriage of justice has resulted from the errors of the trial court.

The judgment and order are reversed and the cause is remanded.

Conrey, P. J., and James, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 9, 1918.