[L. A. No. 19046.   In Bank.   Nov. 28, 1944.]

JEANNENE JOY LUND, a Minor, etc. et al., Appellants, v. PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation), Respondent.

Paul Blackwood and Samuel P. Young for Appellants.

Frank Karr, C. W. Cornell and O. O. Collins for Respondent.

SCHAUER, J.—In this wrongful death action plaintiffs, who are three minor children, appeal from a judgment entered upon a jury verdict denying them recovery from defendant Pacific Electric Railway Company for the death of their mother, Florence Boyd Lund, who died as the result of injuries sustained when an automobile in which she was riding was

struck by an electric car of the railway company. The automobile was operated by decedent's husband, plaintiffs' father, Elmer J. Lund. Plaintiffs do not question the sufficiency of the evidence to sustain the verdict but complain that the trial court erred in giving and in refusing to give certain instructions, in refusing to admit certain evidence offered by plaintiffs, and in uttering certain comments in the presence of the jury. We have concluded that none of plaintiffs' contentions warrants a reversal of the judgment.

The fatal collision occurred at about noon of December 11, 1940, at the intersection of San Vicente and Redondo Boulevards in the city of Los Angeles. The weather was clear. Redondo Boulevard is a paved street running approximately north and south at the locale involved. It is 50 feet wide, except where it intersects San Vicente Boulevard, at which point it is 80 feet wide. San Vicente Boulevard, also a paved street, runs generally east and west and is divided lengthwise in its center by defendant's private, unpaved right of way, which is 53 feet wide and on which defendant maintains two sets of car tracks—the north set for westbound cars and the south set for eastbound cars. East of Redondo Boulevard the right of way extends straight and unobstructed to view for some 5,000 feet; west of Redondo it extends straight and unobstructed to view for approximately 3,500 feet from whence it continues on to the city of Santa Monica. It is separated from the paved roadways of San Vicente Boulevard by fences and by cement curbings so that vehicular traffic is effectively excluded from the track area except at crossings such as Redondo Boulevard, where, by legal requirement, the street pavement is laid flush to the tops of the rails. The distance from the southern curb of the right of way to the southernmost rail is 17 feet, the rails of each set of tracks are said to be spaced approximately five feet from each other, the distance between the two sets of rails is nine feet, and the distance from the northern rail of the westbound tracks to the northern curb of the right of way is 17 feet.

On each side of the right of way is a two-way, paved, public highway, 38 feet wide; that is, traffic runs both east and west on the roadways on each side of the defendant's private right of way. Although these two roadways form, in effect, two separate highways, they are both known as San Vicente Boulevard. Thus, there are six entrances to the intersection (or intersections) of San Vicente and Redondo Boulevards—

two from Redondo and four from San Vicente. Each of the six was posted with a boulevard stop sign. At the northwest corner of the intersection of defendant's right of way with Redondo Boulevard (which forms a rectangle approximately 80 feet·in an east and west direction by 53 feet in a north and south direction) there was a railroad cross-arm sign, and on a pole at the southeast corner there was an automatic signaling device or wigwag the disk of which, when in operation, swung in an east and west direction; i.e., parallel to the car tracks. The wigwag was suspended on an arm at least six feet long westerly from the pole to which it was attached and hung at an elevation of about ten feet above Redondo Boulevard.

At about noon of December 11, 1940, a clear day, Mr. Lund, with his wife sitting beside him in the front seat, was driving his Chevrolet sedan westerly on the north half of that portion of San Vicente Boulevard which is south of the defendant's right of way. He made the boulevard stop at Redondo Boulevard, and then started up and turned to the right or north on to Redondo to cross the tracks. He safely traversed the first, or south, set of tracks, but on the north set of tracks his automobile was struck by an interurban car of defendant, which was traveling westerly. Mr. Lund testified that as he approached Redondo Boulevard he observed the wigwag and looked several times to see if traffic was approaching, either on the highways or on the defendant's tracks; that he saw no cars on the tracks, heard no bell or whistle, and while stopped at the intersection could not see the wigwag overhead and did not hear it ring although he was listening for such a sound; that after making the boulevard stop he started his car in low gear, shifted to second, and was traveling eight or ten miles an hour at the time of the collision; that after he turned right and passed the wigwag pole he did not again look to the right, or east, to see if cars were approaching on the tracks, and did not see the interurban car of defendant until just as his automobile was crossing the third rail, when his wife called out "train" and that the train was then right upon them and struck the right side of the automobile at the door. There was nothing in the landscape to substantially obstruct his view of the approaching electric car. There was testimony from which it could have been found that the interurban car was traveling at a speed anywhere from 20 to 30 or 35 miles an hour, and that its motorman saw the Lund automobile but did not con-

centrate his attention on it exclusively after seeing it come to a stop. Such motorman testified that he saw the automobile make the boulevard stop at Redondo when the interurban car was about 200 feet from the crossing, that he watched it for "a couple of seconds" and then when his car was about 100 feet from the crossing took his eyes off the stopped automobile to look for traffic which might be approaching from other points and did not again see it until too late to stop his car. He testified further that when he was 200 or 300 feet from the crossing he observed that the wigwag was operating and he also blew the whistle on the car. Three disinterested witnesses confirmed that the wigwag was oscillating back and forth and its bell ringing and two of them testified that the whistle of the car was blown; one other disinterested witness testified that he heard no bell or whistle. As stated above, Mrs. Lund, the mother of plaintiffs, died as the result of injuries she received in the collision. It is obvious that the evidence is sufficient to support implied findings that defendant was not negligent and that negligence of the driver Lund was the sole proximate cause of the accident. Reversal is sought, however, upon technical grounds and in considering them we shall assume that the evidence is not, as a matter of law, insufficient to support a finding that defendant was guilty of negligence which contributed proximately to cause the accident.

Plaintiffs first complain that the trial court "erred in instructing the jury over and over that the question of negligence or lack of negligence of the driver [Mr. Lund] was a crucial or determinative issue," and in support of their position quote the following instructions:

"If you find from the evidence that the accident was caused solely by the negligence of the driver of the automobile, then none of the plaintiffs can recover and your verdict should be in favor of the defendant Pacific Electric Railway Company. . . .

"It is the duty of the driver of an automobile to approach railroad tracks at a crossing in such a manner and at such a speed as to be able to control the movements of his automobile and stop the same in the event it should appear to be dangerous to attempt to cross the tracks; and it is further his duty to look and listen before attempting to cross the tracks and to heed the warning of the whistle of an approaching car or train if the same is being blown, and of the crossing signal or wig-

wag if one has been installed and is operating, in order to ascertain if any train or car is approaching the crossing; and if before going upon the track the driver by the use of ordinary care could have seen or known of the existence of an approaching car or train on the tracks, but failed to do so, then such driver would be guilty of negligence . . . .

"If you find that the driver of the automobile, Elmer Lund, was guilty of negligence and that such negligence on his part was the sole proximate cause of the accident, then your verdict must be for the defendant, Pacific Electric Railway Company. . . .

"If you should find that there was negligent conduct on the part of more than one person, you are not to attempt to determine which was guilty of the greater negligence."

These instructions correctly state the law so far as they go, ▉ but plaintiffs, relying upon the cases of *Renowden* v. *Pacific Electric Ry. Co.* (1925), 73 Cal.App. 383, 387 [238 P. 785], and *Krupp* v. *Los Angeles Ry. Corp.* (1943), 57 Cal.App. 2d 695, 698-699 [135 P.2d 424], assert that they tended to lead the jury to believe that the determinative factor in the case was negligence or the lack thereof on the part of Mr. Lund, rather than on the part of defendant. Plaintiffs also maintain that they were entitled to instructions, requested but not given, that the negligence of Mr. Lund could not be imputed to them, and that if both Mr. Lund and the defendant were negligent and if their concurring negligence was "the sole proximate cause of the accident" the jury were not to compare the negligence of one with that of the other but should return a verdict for plaintiffs. That the court should have given these instructions or their equivalent is established by the Renowden and Krupp cases. In the latter case, in which the plaintiffs sought recovery for injuries suffered when the automobile in which they were riding was struck by a streetcar of the defendant therein it was pointed out (at page 698 of 57 Cal. App. 2d) that "the ultimate question for the determination of the jury was whether defendants were guilty of negligence [proximately] contributing to plaintiffs' injuries. The conduct of the driver of the automobile, not being in issue, was admissible in evidence only to the extent that it might aid in the determination of the question of the negligence of defendants."

▉ Defendant seeks to justify on several grounds the giving of the instructions on the subject of Mr. Lund's as-

serted negligence. It points out that it did not rely merely on a denial that it was negligent, or that its negligence proximately caused the accident, but that it affirmatively pleaded, as its third separate defense, ''That the accident and resultant damages, if any, by plaintiffs sustained were caused solely by the negligence of Elmer J. Lund, the driver of said automobile, in that he so carelessly, negligently, and unlawfully operated the same as to cause the accident mentioned in plaintiffs' complaint and damages, if any, by plaintiffs sustained.'' There is authority for the proposition that when such an issue is specifically raised by the pleadings the giving of an appropriate instruction thereon is proper *(Dieterle* v. *Yellow Cab Co.* (1942), 53 Cal.App.2d 691, 699 [128 P.2d 132]; see, also, *Ennulat* v. *Taylor* (1932), 127 Cal.App. 420, 423 [15 P.2d 900]; *Haber* v. *Pacific Electric Ry. Co.* (1926), 78 Cal.App. 617, 636-637 [248 P. 741]) but this does not entirely answer the argument of appellants on this phase of the case in that, as above disclosed, they attack not only the subject matter of the instructions which were given, but also their form, and complain that the giving of such instructions, coupled with the court's failure to give the instructions asked by them on the subject, may have resulted in misleading the jury into an erroneous and prejudicial concept of what constituted the ultimately controlling issue in the case. Assuming (but not holding) that the selected instructions hereinabove quoted could, when detached from the remainder of the charge, have the effect suggested, and bearing in mind the refusal of the court to give the precise instructions on the subject requested by plaintiffs, the record nevertheless negatives any prejudice to plaintiffs in this regard. ■ It is elementary that a judgment will not be reversed for error which can be found only by detaching a portion or portions of a charge from the context, when such charge in its entirety fairly and correctly states the law. ■ Here, although the court did not use the language suggested by plaintiffs, it did adequately instruct the jury to the effect that if they found defendant to have been guilty of negligence and ''that such act of negligence was the proximate cause of the accident or that such act of negligence, *combined with negligence on the part of Mr. Lund,* was *one* [italics added] of the proximate causes of the accident; and . . . that the mother of the plaintiffs received injuries which

caused her death as a result of that accident," then plaintiffs were entitled to a verdict against defendant. This latter instruction necessarily negatived the theory that Mr. Lund's negligence could be imputed to the plaintiffs in bar of their claim; by it the jury were informed that if any negligence on the part of defendant had proximately contributed to the accident, whether it operated alone or "combined with negligence on the part of Mr. Lund," then plaintiffs were entitled to recover, and at no time were they instructed that recovery should be denied by reason of negligence on the part of Mr. Lund contributing with that of defendant to cause the fatal accident. On the contrary they were told that "the acts and omissions of two or more persons may work concurrently as the efficient causes of an injury, and in such a case, each of the participating acts or omissions is regarded in law as a proximate cause" and "The law forbids you to attempt to classify negligence into degrees . . ., or to compare one instance of negligence with another . . . If you should find that there was negligent conduct on the part of more than one person, you are not to attempt to determine which was guilty of the greater negligence." We are satisfied that the instructions taken as a whole were not prejudicial to plaintiffs.

Plaintiffs contend further that the court erred (1) in rejecting evidence of a Los Angeles city ordinance regulating the speed of *streetcars* and in instructing the jury that defendant "had a right to operate its electric car at any rate of speed it saw fit, consistent with ordinary care," and (2) in giving instructions which made applicable to the conduct of Mr. Lund and of the motorman of defendant's car the grade-crossing rules of the steam or commercial railroad cases (see *Peri* v. *Los Angeles Junction Ry.* (1943), 22 Cal.2d 111, 120 [137 P.2d 441]; *Rasmussen* v. *Fresno Traction Co.* (1936), 15 Cal.App.2d 356, 363 [59 P.2d 617]) rather than the rules relating to the operation of streetcars (see *Scott* v. *San Bernardino Valley etc. Co.* (1908), 152 Cal. 604, 610-611 [93 P. 677]). The law of this state has already been settled adversely to plaintiffs' position. Here the defendant's cars were operated in interurban service upon tracks laid upon a private right of way, rather than upon city streets. Under such circumstances the rules governing their operation, including the traversing of street intersections, are those pertaining generally to steam or commercial railroads and not those applicable peculiarly to

streetcars which use the city streets in common with other traffic. (See *Simoneau* v. *Pacific Electric Ry. Co.* (1911), 159 Cal. 494, 496-501 [115 P. 329]; *Riney* v. *Pacific Electric Ry. Co.* (1919), 45 Cal.App. 145, 148 [187 P. 50]; *Cash* v. *Los Angeles Ry. Corp.* (1935), 6 Cal.App.2d 738, 740 [45 P.2d 280].)

It is not the motive power which fixes the character of a railroad transit operation. A transcontinental train carrying passengers or freight or both, operating principally over a private right of way, is nonetheless in character as a transcontinental train whether propelled by steam or by internal combustion engines or by electric power. Neither does it become a "street car" by virtue of the fact that its tracks cross public highways. The interest of the public in rapid transportation between cities, the size and weight and speed of the train, the force of its inertia and the controllability thereof relative to that of vehicular traffic ordinarily using public highways, are elements which have received consideration in the evolvement of rules of law pertaining to the reciprocal rights and duties of railroads and the public in their joint use of crossing areas. Streetcars, relatively light in weight, slower in speed, more flexible in control, operating on shorter runs and characteristically on and along city streets, using the streets more or less in common with the public, are, reasonably, subjected to rules which differ from the typical commercial railroad rules in that, generally speaking, they require the streetcar operator to recognize that he is sharing the use of the streets with the public on a more nearly equal basis, that the performance of his function does not require high speeds over long distances without stops, but rather entails slower speeds, frequent stops, and flexibility of control.

With the differences in character of construction, function, and operation so marked there is relatively little confusion in the cases insofar as concerns distinguishing between commercial railroads and streetcars. But also prominent in the field of transportation is the hybrid interurban line. It partakes somewhat of the character of both its ancestors. It feels the urge for rapid transit over substantial distances between cities; but it also must deliver its passengers to the heart of metropolitan areas. It uses city streets, subways, elevateds, and private rights of way; its tracks cross public highways. Certainly its trains are not as heavy, their speeds not as high, and their runs not as long as are those

of the typical transcontinental railroad. But, equally obvious, its trains or cars are not as light, their speeds are higher and their runs usually longer than are those of the ordinary streetcar. Its principal function is more like that of the through railroad than of the city street railway. The streetcar normally transports passengers over city streets from one street corner to another, all within a built up area. The interurban line provides for reasonably rapid transit over longer runs with fewer stops from one city to another. Insofar as it operates between stations on a private right of way the character of which is plainly visible, it conforms approximately to the character of a commercial railroad and its conduct in the premises is to be gauged accordingly by appropriate standards.

The ordinance which plaintiffs sought to introduce in evidence is entitled "Street Car Speed" and it ordains that "The operator of any street car shall not drive said street car at a speed exceeding the following," etc. If the drafters of the ordinance had intended to make it applicable to commercial railroad trains or to interurban service it would have been easy to so provide. Neither the expression "railroad train" nor "interurban train" (or "interurban car") is synonymous with the phrase "street car." Upon the record before us it is clear that at the time and place in question defendant's car was being operated as a unit of an interurban rapid transit system and not as a streetcar. Hence no error was committed in refusing to admit evidence of the ordinance pertaining to streetcars, or by instructing the jury on the rules governing the care to be observed at commercial railroad crossings rather than on those applicable to streetcar intersections. The rights of the plaintiffs in the premises, and the correlative duties of the defendant, were properly defined in the instructions which the court gave, including the express declarations that "Whether a given rate of speed is a negligent one is a question of fact for the jury to determine, the answer to which depends upon all the surrounding circumstances" and that "While a railway company has the right to run its electric cars over and upon a public crossing such as the one here involved, in running its cars thereon, where the public also has a right to travel, the Railway Company must exercise such care and precaution for the purpose of avoiding accidents, injuring property or persons, as reasonable prudence would suggest, and as are in its power to employ.

"It is the duty of those in charge of a train or car when approaching a public highway to give notice of the approach and its traveling over said highway by all warnings reasonably necessary under the conditions existing at the time and place in question."

Plaintiffs next urge that the court erred in failing to give their requested instruction stating the last clear chance doctrine. After setting forth the elements of that doctrine, commencing with "First: . . . Plaintiff, by his own negligence, got himself into a position of danger," the requested instruction concluded, "If all the conditions just mentioned are found by you to have existed with respect to the accident in question, then you must find against the *defense of contributory negligence. . . .*" (Italics added.) Thus the proposed instruction recognizes that the doctrine of last clear chance comes into play only to enable a plaintiff to recover despite negligence on his or her own part; i.e., the doctrine operates, where all of its elements are present, to defeat the defense of contributory negligence. (See *Johnson* v. *Sacramento Northern Ry.* (1942), 54 Cal.App.2d 528, 531, 533 [129 P.2d 503], and cases there cited.) That defense was specially pleaded by defendant in this action. However, in connection therewith, the court gave the following instructions to the jury:

"The defendant by its answer presents three different defenses: . . . SECOND: That the decedent Florence Lund was guilty of negligence proximately contributing to the accident and her death.

"This second defense *need not be considered by you* for two reasons: first, that the law presumes that Mrs. Lund used ordinary care for her own safety and no evidence has been introduced to overcome this presumption; and secondly, even if Mrs. Lund has been guilty of negligence which, were she alive and bringing an action to recover damages for her own injuries would constitute contributory negligence on her part, such contributory negligence cannot be imputed to her minor children, the plaintiffs in this case." (Italics added.)

Thus the jury were clearly and positively instructed that they were to ignore the defense of contributory negligence, and although the second of the reasons assigned by the trial court therefor—that contributory negligence on the part of Mrs. Lund could not "be imputed to her minor children, the plaintiffs in this case" was erroneous (see 8 Cal.Jur. 988-989, § 41), the error was favorable, rather than prejudicial, to

plaintiffs. Inasmuch as the last clear chance doctrine may be utilized only to defeat the defense of contributory negligence, and the jury were instructed not to consider such defense, the requested instruction was not relevant to the submitted issues and failure to give it could not have prejudiced plaintiffs' case.

Lastly, plaintiffs assert that various remarks of the trial judge in the presence of the jury constituted misconduct requiring the judgment to be reversed. We have reviewed the record in its entirety, including the statements complained of, and do not perceive that they could have influenced the jury to plaintiffs' prejudice. Moreover, plaintiffs did not, during the course of the trial, object to the remarks and they may not raise the point for the first time on appeal. (See *Hughes* v. *Hartman* (1929), 206 Cal. 199, 206 [273 P. 560]; *Karwoski* v. *Grant* (1938), 30 Cal.App.2d 171, 178 [85 P.2d 944].)

For the reasons above stated, the judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds J., and Traynor, J., concurred.

CARTER, J.—I dissent. Although as held by the majority opinion the evidence may be sufficient to support the implied findings of the jury that defendant was not negligent and that negligence of the driver Lund was the sole proximate cause of the accident, yet there was substantial evidence tending to show negligence on the part of the defendant, which would have supported findings in plaintiffs' favor. Under the particular circumstances of the occurrence of the accident, I do not believe that the jury was adequately or correctly instructed, which deficiency, together with improper and wholly uncalled for remarks of the trial judge, resulted in such prejudice as to require in my opinion, a reversal of the judgment.

The record discloses that the intersection of Redondo and San Vicente Boulevards is a heavily traveled one, and there was testimony that defendant's electric car which had no passengers and was on its way to the car house came into the intersection at approximately 35 miles per hour. The impact carried the Chevrolet sedan in which deceased was riding 132 feet. Mr. Lund who was driving the automobile heard neither bell nor whistle sounding at any time before the accident. His testimony was supported by the testimony of Mr. Bean, a witness who was driving alongside the streetcar as it approached the intersection. Mr. Bean further testified that

the streetcar did not slow down until after the collision. One other witness also testified that she heard no whistle. The wigwag device is "cut in" so as when working properly to start swinging and ringing a bell when a streetcar from the east going west is approximately 1,927 feet from the wigwag at Redondo Boulevard. Mr. Lund testified that when he was about 160 feet to 200 feet from Redondo he saw the edge of the wigwag; and it was not oscillating, nor ringing. Defendant's motorman testified he saw the Lund automobile come to a stop at Redondo Boulevard when he was about 300 feet from the intersection and did not see it again until the automobile was "practically in front of his car," although he also testified that he was looking for traffic during at least the last 100 feet before reaching the intersection. Mr. Lund, after making a boulevard stop, started his car in low gear, shifted to second gear, and was traveling slowly, at a rate of about 8 or 10 miles per hour across the tracks at the time of the collision. He had proceeded about 32 or 33 feet from the southernmost boundary of the right of way when struck. He testified that he did not again look east, the direction from which the electric car approached after turning right, onto Redondo Boulevard.

In view of the foregoing testimony which creates a sharp conflict in the evidence concerning the conduct of defendant's motorman, and taking into consideration the prominent part played by Mr. Lund in the occurrence of events leading up to the accident, together with the inferences of negligence that such conduct may have created in the minds of the jury, it became particularly important that the jury be fully and clearly instructed in regard to the law of imputed negligence. This, the instructions of the trial judge fail to do. The right of the plaintiffs to recover, unaffected by the conduct of Mr. Lund, which was only inferentially covered by the instructions, was as to the jurors in all probability wholly offset by the emphasis placed upon the duty of care incumbent upon Mr. Lund to take in approaching railroad tracks, and the detailed circumstances under which he might be deemed guilty of negligence. And while it is correct to say that if the accident was caused solely as the result of negligence on his part, there could be no recovery, yet repeated emphasis upon his conduct could not help but detract attention from the main issue of whether or not there was negligence on the part of the defendant which would entitle plaintiffs to judgment if proxi-

mately contributing to the accident with or without concurring negligence of Mr. Lund.

The situation is very close to that which faced the court in *Krupp* v. *Los Angeles Ry. Corp.* (1943), 57 Cal.App.2d 695 [135 P.2d 424], where in reversing a judgment for defendant it was pointed out that, ''The laymen constituting the jury were not aided in their determination of the question of negligence of defendants by an elaborate statement of the rights and duties of someone not a party to the litigation together with the admonition that if the conduct of such third party was the sole cause of plaintiffs' injuries the verdict should be for defendants.'' If the defendant was entitled to this type of instruction, no less were the plaintiffs entitled to have the jury clearly informed in a tenor consonant with such instructions that any negligence of Mr. Lund, the driver of the automobile, could not be imputed to them.

In addition to the instructions in all instances being made in the most favorable light to defendant's case, and at times being prejudicial to plaintiffs, it appears upon the face of the record that the trial judge throughout the trial maintained an attitude antagonistic to the presentation of plaintiffs' case and freely and out of turn made remarks in the presence of the jury, in the light of which, I am convinced that the plaintiffs did not have a fair trial. Nine such instances are assigned as error on behalf of appellants. The majority opinion avoids a consideration of these remarks, largely upon the ground that no objection or exception on behalf of the plaintiffs, the 1, 3, and 5 year old children of the deceased Mrs. Lund, was taken at the trial. It is plain, however, that such objection would have availed nothing. This is shown by the court's refusal to give plaintiffs' requested instruction, ''. . . that if the judge has said or done anything which has suggested to you that he is inclined to favor the claims or position of either party, you will not suffer yourself to be influenced by such suggestion,'' and that ''I have not expressed, nor intended to express, nor have I intimated nor intended to intimate, any opinion as to what witnesses are, or are not worthy of credence; what facts are, or are not established; or what inferences should be drawn from the evidence adduced. If any expression of mine has seemed to indicate an opinion relating to any of these matters, I instruct you to disregard it.'' Furthermore, both of the authorities cited in the majority opinion

recognize that where there has been a persistent course of misconduct on the part of the trial judge, or where the remarks are of such character that the prejudicial effect could not be cured by subsequent action of the trial court, the strict rule does not apply. *(Hughes* v. *Hartman,* 206 Cal. 199, 203 [273 P. 560]; *Karwoski* v. *Grant,* 30 Cal.App.2d 171, 178-179 [85 P.2d 944].)

Some of the prejudicial misconduct, to which I refer, occurred when plaintiffs' counsel sought to impeach defendant's witnesses by reading inconsistent statements made by them, taken from the transcripts of testimony of a previous trial in this same action and at the coroner's inquest. The trial judge, while allowing some of these statements in evidence, preceded the reading thereof, with his opinion, expressed in the presence and hearing of the jury, that he could not see that it was impeaching, and at one time went so far as to remark, "Well, if you think that is impeachment . . . I guess the jury can take care of that," and at another time after the witness Mrs. Stuhr had placed the Lund automobile at one automobile length from the southernmost rail and the street car 75 feet to 100 feet away, counsel for plaintiff was allowed to read her testimony at the former trial where she placed the electric car 130 feet away and the automobile on the tracks. This was a material difference bearing upon the issues of fault and the speed and care with which the electric car was being driven, but whatever weight it might have had in the minds of the jury as impeaching testimony or upon the credibility of the witness was completely nullified by the following question asked Mrs. Stuhr by the court: "I do not suppose, Mrs. Stuhr, that you took a tape line and measured the distance that you testified to?" This question was asked just before Mr. Young, one of the counsel for plaintiffs, started to read from the transcript. It is obvious that the practical effect of this question was to minimize if not destroy the weight of the impeaching testimony so that the jury would not give effect to it. If there was any inconsistency in the testimony to submit to the jury, as the transcript discloses there was, it became a matter for the jury to determine, how far the inconsistencies went toward weakening the later testimony, or impairing the credibility of the witnesses. *(Abbott* v. *Coronado Beach Co.,* 55 Cal.App. 179 [203 P. 145]; *People* v. *Vogel,* 36 Cal.App. 216 [171 P.

978]; *Vietti* v. *Hines*, 48 Cal.App. 266, 275 [192 P. 80]; *Firth* v. *Southern Pacific Co.*, 44 Cal.App. 511 [186 P. 815].)

In *Abbott* v. *Coronado Beach Co.*, 55 Cal.App. 179 [203 P. 145], it was sought to impeach a witness's testimony by showing that it was inconsistent with statements theretofore made by her at another trial. It appears that the trial judge referring to the testimony which she had formerly given, stated in the presence and hearing of the jury: "I hardly think there is such a conflict as to impeach the testimony given here." As to this the appellate court said, "That this was gross error admits of no controversy. Defendant sought to impeach the witness in the method prescribed by sections 2051 and 2052 of the Code of Civil Procedure, and the question as to whether there was a conflict and, if there was, the extent to which the credibility of the witness was affected, was one solely and alone for the jury. (*People* v. *Wallace*, 89 Cal. 158 [26 P. 650]; *Schneider* v. *Market St. Ry. Co.*, 134 Cal. 482 [66 P. 734].) In *People* v. *Vogel*, 36 Cal.App. 216 [171 P. 978], the trial judge was guilty of a like act of misconduct by stating in the presence of the jury: 'The evidence in the transcript which has been produced, I do not consider as impeachment.' In referring to such statement so made by the judge this court said: 'His action in that regard was uncalled for. . . . His statement was distinctly prejudicial to the rights of the appellant.' "

As has been pointed out a number of times (and in cases appealed from the particular department of the superior court presided over by this same trial judge), a trial judge, by reason of the high and authoritative position occupied by him, is an influential person with the layman juror, who too often is ready to accept the judge's views and indication of opinion as his own without further consideration of the matter for himself, therefore the trial judge should be extremely careful so as not to exert his influence to the unfair advantage of one party and to the detriment of the other. (*People* v. *Mahoney*, 201 Cal. 618, 626-627 [258 P. 607]; *People* v. *Williams*, 55 Cal.App.2d 696 [131 P.2d 851]; *Anderson* v. *Mothershead*, 19 Cal.App.2d 97 [64 P.2d 995]; *People* v. *Earl*, 10 Cal.App.2d 163 [51 P.2d 147]; *People* v. *Johnson*, 11 Cal. App.2d 22 [52 P.2d 964].) This was a close case and the statements made by the trial court may well have been the determining factor.

The majority opinion brushes aside appellants' charge of misconduct of the trial judge with the statement that "We have reviewed the record in its entirety, including the statements complained of, and do not perceive that they could have influenced the jury to plaintiffs' prejudice." But my experience in the trial of jury cases leads me to exactly the opposite conclusion. In my opinion the misconduct of the trial judge in this case was the controlling factor in influencing the jury to return a verdict in favor of the defendant. To hold that plaintiffs cannot now raise the question of misconduct because no objections were made to the remarks of the trial court during the trial is requiring plaintiffs to do an obviously idle act, because it is obvious from a study of the record that had plaintiffs' counsel objected to the facetious and caustic remarks of the trial judge he would simply have invited further abuse and intimidation.

I think it is time that this court should assume a more realistic approach to problems of this character and recognize the fact that there are trial judges who are temperamentally unfit for the trial of certain types of cases at least, and when a record of the character of the one now before us is presented to this court, and an obvious miscarriage of justice has resulted, the judgment should be reversed on the sole ground of the misconduct of the trial judge, to the end that such miscarriages of justice may not be repeated, and that it may be said in truth "that a court is a place where *justice* is *judicially* administered."

In my opinion the judgment should be reversed.

Appellants' petition for a rehearing was denied December 21, 1944. Carter, J., voted for a rehearing.