[Civ. No. 15499.   Second Dist., Div. One.   Mar. 21, 1947.]

ELIZABETH MARIE CARNEY, a Minor, etc., Appellant, v. RKO RADIO PICTURES, INC. (a Corporation) et al., Respondents.

Earl E. Howard and Gilbert J. Heyfron for Appellant.

Elbert E. Hensley and John H. Klenke for Respondents.

WHITE, J.—In this action for the wrongful death of the father of the minor plaintiff, a jury returned a verdict in favor of defendants. From the judgment entered on such verdict plaintiff appeals. Plaintiff also attempts to appeal from the order denying her motion for a new trial.

The decedent was struck by an automobile owned by defendant RKO Radio Pictures, Inc., and driven by defendant Richmond, who was then and there an employee of his co-defendant, and operating the vehicle within the scope and course of his employment. By their answer to plaintiff's complaint defendants denied that the driver, Richmond, was guilty of negligence, denied that the injuries sustained in the collision were the proximate cause of decedent's death, and as affirmative defenses alleged that the decedent was guilty of contributory negligence and that the accident was unavoidable. Upon this appeal it is not contended that the verdict is unsupported by the evidence, but it is asserted by appellant that prejudicial error, resulting in a miscarriage of justice, occurred by reason of the giving of certain instructions and the admission of certain evidence.

The defendant Richmond was driving the Pontiac sedan owned by defendant RKO Pictures, Inc., westerly on Sunset Boulevard in the city of Los Angeles, about 6:30 p. m. on April 16, 1944. The vehicle was being driven in the lane nearest the center of the street, on the streetcar tracks. The decedent was in a streetcar loading zone or "safety zone" located on the north side of the tracks and just east of the intersection of Silver Lake Boulevard. As the automobile approached the intersection, passing to the south of the safety zone, the decedent stepped out of the safety zone and was struck by, or walked into, the front fender of the vehicle. There was conflicting testimony as to the speed of the automobile, as to whether the decedent was in the marked crosswalk when he was struck, and as to whether the automatic traffic signals were red or green for Sunset Boulevard traffic.

The owner of a barber shop located on the southeast corner of the intersection testified that he heard a crash, looked out

of his shop, and saw the automobile; that the decedent was thrown, rolled away from the car and landed in the crosswalk; that the automobile went on into the intersection before it stopped; that at the time he looked up he saw the traffic signals; "I looked at the one going westward; it was red and the one on the other side was green." On cross-examination he testified that when he first saw the automobile the back end of it was at about the middle of the safety zone (the safety zone it was stipulated, was 55 feet long); that his attention was attracted by hearing a noise; that the automobile was between him and the pedestrian; that he did not see the pedestrian before he was hit.

A newspaper vendor testified that he was standing on the southeast corner of the intersection selling papers; that he was looking north; that he saw decedent start to walk toward him, saw him take his first step, and as soon as the man was hit he looked at the traffic signal on the northeast corner and that it was red; that the driver "came through a bunch of cars that were already stopped at the stop sign"; that he did not notice the signal on the Silver Lake side of the intersection. He further testified that when he first saw decedent, "he had just entered inside the line there from the safety zone into the crosswalk" and was just in the act of taking a step toward the witness. The witness estitmated the speed of the car at 30 miles per hour.

Another witness testified that he was standing alongside the newsman; that the decedent "got off in the safety zone, and the light was green and he walked on into the crosswalk and the light turned red."

". . . Q. That is, the light on the northeast corner . . . turned red? A. Yes. Q. And you saw the pedestrian stop? A. Well, when it turned red in about 3 — 1, 2, 3 — he started across and he just got over the first rail there . . . and this car same along and hit him and threw him about 8 feet across that safety zone." He further testified that about "three seconds" after the light turned red the other signal (for Silver Lake traffic) turned green; that the automobile in question came through the intersection after two other lines of cars had stopped; that he did not see the decedent look toward the car.

The defendant driver testified that as he approached Silver Lake Boulevard the signals were green; that there were five or six pedestrians in the safety zone; that he was going 25 miles

per hour, but slowed down as he neared the safety zone to about ten or twelve miles per hour. "As I drove along the edge of the safety zone I got a flash of this gentleman in the safety zone. As I looked over to see if I still had a clearance to a 'Go' signal, and I had just started to step on the gas, and I looked again and he was at the west end of the safety zone about to step out. About that time I got a flash of the man as he stepped into the right fender of the car. . . . I was a trifle east of him. . . . possibly five or six feet. . . . Q. You didn't know you were going to strike him until he took the third step, did you? A. No, sir. . . . he had not completed his third step when he stepped into the fender.'' The witness indicated the course of the pedestrian as southwesterly from the southwest corner of the safety zone. He further testified that the signal remained green until he had stopped his car; that the injured man said he "must have looked at the wrong signal''; that the decedent was never at any time within the crosswalk or in front of the automobile, but stepped into the side of the right front fender as the witness sought to avoid the accident by swerving to the left.

The defendant driver further testified that he helped Mr. Carney to the automobile and took him to the Hollywood Receiving Hospital; that he could smell the odor of liquor on Mr. Carney's breath.

The testimony of defendant Richmond was substantially corroborated by that of Corporal Stocker, a passenger in defendant's vehicle, who testified that the pedestrian was not in the crosswalk at the time of the accident, but was "angling across the street in a southwest direction and he was outside of any zone.''

In support of their contention that the death of decedent was not proximately caused by the accident, defendants introduced the evidence of two physicians of the Hollywood Receiving Hospital, where the decedent was taken by the defendant Richmond directly from the scene of the accident. Dr. Jesse testified that he was an orthopaedic surgeon experienced in operations connected with injuries similar to that sustained by the decedent; that early on the morning of April 16, 1944, he read the clinical history of Mr. Carney which had been taken by the nurse and doctor on duty during the night of April 15th, and after which he examined Mr. Carney and corroborated the patient's history as had been written up, which was done in connection with his diagnosis of Mr. Carney's con-

dition and injuries; that he smelled the odor of intoxicating liquor on Mr. Carney's breath, and Carney admitted he had been drinking prior to the time of the accident and had a "few shots and some beer"; that he had for many years been a heavy user of intoxicating liquor; that Carney was not in condition to be operated on at the time of the examination on April 16, 1944, and therefore was not transferred to the orthopaedic surgery ward until two days later; that X-rays had already been taken prior to his examination and said X-rays were viewed in connection with his examination and treatment of Carney; that he continued to attend and treat Carney; that his condition insofar as the injuries received in the accident were concerned continued to improve; that it was necessary for Carney to be treated for his alcoholic condition as well as for the fractures he had received in the collision; that about 10 o'clock on the evening of April 23, 1944, Carney began hemorrhaging from a ruptured esophagus as a result of which bright red blood, free from any sputum, came out through the mouth; that some blood passed into the intestines but there was no intestinal bleeding; that Carney had cirrhosis of the liver; that by reason of the condition of the liver and arteries the inter-venous blood pressure was sufficiently great to produce a rupture wherever the pressure was concentrated; that whenever the pressure becomes localized at a weakened place in a vessel it may produce a rupture, which in this instance occurred in the esophagus; that the hemorrhage which caused his death was not caused by the accident, but might have developed sooner had the accident not occurred, as the shock would tend to lower the blood pressure. Dr. Sugarman, who also treated Mr. Carney, testified to the same effect, that the immediate cause of death was the ruptured esophagus, which would have occurred as it did even though there had been no accident. This testimony was in contradiction of that of the autopsy surgeon, who stated that from his examination of the body he was of opinion that the deceased died as a result of the injuries received in the accident.

Two police officers testified that they interviewed the decedent at the hosptial; that the odor of liquor was on his breath. Objections were sustained to proffered testimony by the officers as to admissions made by decedent that he looked at the "wrong signal," that he had had "a few shots and some beer," and that he had not looked in the direction from which the automobile approached.

It is asserted by appellant that the trial court erred in giving conflicting and contradictory instructions. The basis for this contention is that in the settled statement on appeal the two following instructions appear in succession:

"45. (101-B) You will note that the person whose conduct we set up as a standard is not the extraordinarily cautious individual, nor the exceptionally skillful one, but a person of reasonable and ordinary prudence. While exceptional skill is to be admired and encouraged, the law does not demand it as a general standard of conduct.

"46. (149-A) If you should find from the evidence that a party to this action conducted himself in violation of the section just read to you, you are instructed that such conduct constituted negligence as a matter of law."

While the foregoing instructions appear consecutively in the settled statement, it is alleged by respondent that they were not given in that order, but that No. 46 (BAJI No. 149-A) followed No. 35 (BAJI No. 149), to the effect that conduct in violation of sections 562 and 563 of the Vehicle Code constituted negligence *per se,* or rather, a presumption of negligence which might be overcome by other evidence that under the circumstances the conduct was excusable or justifiable.

Under the same heading appellant charges prejudicial error in the giving of an instruction to the effect that it was the duty of the pedestrian "to obey such traffic signals and not to attempt to cross or start across Sunset Boulevard unless and until such traffic signals were actually red or "stop" for traffic going east and west on Sunset Boulevard and green or "go" for traffic going north and south on Silver Lake Boulevard." This instruction is supported by the cases' of *Hurtel* v. *Albert Cohn, Inc.,* 5 Cal.2d 145 [52 P.2d 922], and *Leek* v. *Western Union Tel. Co.,* 20 Cal.App.2d 374 [66 P.2d 1232]. The cases cited by appellant do not support the contention that the pedestrian was not required to wait for the released traffic. *Taylor* v. *Sims,* 72 Cal.App.2d 60 [164 P.2d 17], involved two automobiles, and it was held that a driver entering an intersection controlled by traffic signals was not required to maintain a look-out for vehicles which might enter the intersection in violation of the signal; while in *Morgan* v. *Los Angeles R. & G. Corp.,* 105 Cal.App. 224 [287 P. 152], it was held that under all the evidence the circumstances presented a question of fact for the jury.

Appellant complains further of instructions (1) that if the pedestrian crossed the street outside of a marked crosswalk, and failed to yield the right-of-way (Veh. Code. § 562, subd. (a)), such conduct constituted negligence, and if it contributed to the accident the verdict should be for the defendants; (2) that even though the pedestrian was in a crosswalk he was nevertheless required to exercise ordinary care for his own safety; (3) that if the decedent died as a result of a disease or pathological condition which was not the natural and probable consequence of the injuries, the verdict should be for the defendants.

It is urged that the first two instructions are ''formula'' instructions and that neither had any pertinency to a situation where the intersection was controlled by traffic signals. The instructions were correct statements of the law. There was some testimony that the pedestrian was not within the crosswalk, but was attempting to cross the street at an angle and at a point east of the crosswalk. The east boundary of the crosswalk was ten or twelve feet from the west end of the safety zone. The instruction that the pedestrian was required to exercise ordinary care even though in the marked crosswalk was pertinent. There was testimony, for instance, properly received as part of the res gestae, that Mr. Carney, immediately after the accident, said that he ''must have looked at the wrong signal.'' It was also possible under the evidence for the jury to conclude that Mr. Carney stepped into the path of the car simultaneously with the change of signal and failed to look to his left, and that it was then too late to avoid striking him.

There is no merit to the contention that by the alleged ''formula'' instructions the jury was virtually directed to find for the defendants. By its instructions the trial court attempted to cover all the factual theories advanced by either side and supported by substantial evidence. It was not required to, and could not, embody all of the issues of the case in a single instruction. (*Hall* v. *Steele,* 193 Cal. 602, 609 [226 P. 854].) ''. . . the charge to the jury must be read in its entirety, each instruction being considered in connection with the others. If they harmonize as a whole and fairly and accurately state the law, a reversal may not be had because of verbal inaccuracies, or because a separate instruction does not contain all of the elements which are to be gathered from the instructions as a whole.'' (*Westover* v. *City of Los An-*

*geles,* 20 Cal.2d 635, 637 [128 P.2d 350].) The instructions challenged by appellant as "formula" instructions, or as assuming the existence of facts in dispute, are to be considered, not separately from their context, but as part of the entire charge to the jury. When so considered, they are correct statements of the law, and a reading of the entire charge discloses that the jury was fully and fairly instructed upon all issues.

What has just been said applies also to the complaint that instructions Nos. 45 and 46 hereinbefore set forth were conflicting. As heretofore stated, the entire charge to the jury fairly and correctly stated the law. ■ A judgment will not be reversed for error which can be found only by detaching a portion or portions of a charge from the context, when such charge in its entirety fairly and correctly states the law. (*Lund* v. *Pacific Elec. Ry. Co.,* 25 Cal.2d 287 [153 P.2d 705].) From a consideration of the entire cause, including all the instructions, it must be concluded that no miscarriage of justice has resulted, and in such circumstances the judgment may not be reversed. (Cal. Const., art VI, § 4½; *Wood* v. *Moore,* 64 Cal.App.2d 144, 150 [148 P.2d 91]; *Radisich* v. *Franco-Ital. Packing Co.,* 68 Cal.App.2d 825, 842 [158 P.2d 435]; *Ellison* v. *Lang Transportation Co.,* 12 Cal.2d 355 [84 P.2d 510]; *Marr* v. *Postal Union Life Ins. Assoc.,* 40 Cal.App. 2d 673 [105 P.2d 649].) ■ The asserted error in instructing the jury that plaintiff could not recover if decedent died as a result of a disease not the natural and probable consequence of his injuries was not prejudicial. By other instructions the jury was properly informed as to what constituted proximate cause.

■ We come now to a consideration of the asserted errors in admitting testimony of the police officers as to the alcoholic breath of the decedent and the testimony of the two doctors heretofore set forth as to decedent's previous alcoholic indulgence. At the outset, it should be noted that no objection was made to the testimony of the police officers, or the physicians, so far as the statement on appeal discloses. Testimony as to the decedent's alcoholic breath had already been received from the defendant driver, likewise without objection. No motion to strike was made, so far as the record discloses. Appellant cites cases to the effect that "where the weight of the evidence shows a party to have been entirely sober at

the time of the accident, the admission of such testimony is reversible error." Such cases are not in point.

■ In support of their diagnosis as to the cause of death, the two physicians from the receiving hospital who testified on behalf of defendant relied in part upon the patient's history as given by him and the facts set forth in the clinical record of the hospital. Their evidence disclosed an alcoholic condition at the time of decedent's admission to the hospital and also an alcoholic history. The hospital record was not admitted in evidence in its entirety, but portions thereof were read into the record. A hospital record is admissible in evidence, when relevant to an issue and when a proper foundation has been laid. (Code Civ. Proc., §§ 1953e, 1953f; *McDowd* v. *Pig'n Whistle Corp.*, 26 Cal.2d 696, 700, 701 [160 P.2d 797], and cases cited.) ■ In the instant cause, however, appellant predicates error upon the fact that although the trial court admitted only portions of the document, the entire record was taken into the jury room, and that the following entry, which had been excluded by the court, thereby got to the jury:

"4-15-44 50 year old Cauc male
"10 p. m. C.C. & P.I. (Stepped off streetcar. Looked wrong way and was struck by automobile as he walked across street.) (Was knocked down) (Denies being out) Hurt left hip and leg.
"H. B. D.—few 'shots' & some beer."

This alleged error was made one of the grounds of a motion for a new trial, supported by affidavits of two jurors. The clerk of the trial court filed an affidavit to the effect that the document did not go to the jury room. Appellant asserted on oral argument that the clerk's affidavit merely stated that he did not think it went to the jury room. The record on appeal contains none of the affidavits in question, although counsel argued the cause on the assumption that such affidavits are before this court. However, there is no question but that the issue was raised on motion for a new trial and decided by the court adversely to appellant upon conflicting affidavits. This decision, in effect holding that no prejudicial error was shown, finds support in a consideration of the entire record. Evidence as to decedent's drinking had already been received in evidence without objection. Evidence as to his alcoholic history, liver condition and high blood pressure was proper in support of respondent's contention that the accident

was not the proximate cause of the death. In view of all the evidence presented, it cannot be held that there has been a miscarriage of justice.

The attempted appeal from the order denying the motion for a new trial is dismissed. The judgment is affirmed.

York, P. J., and Doran, J., concurred.